AO 91 (REV.5/85) Criminal Complaint

AUSAs Tiffany J. Tracy (312) 353-4045
Peter M. Flanagan (312) 469-6235
Christopher Grohman(312) 469-6132

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**FILED**

UNITED STATES OF AMERICA

**CRIMINAL COMPLAINT**

v.

CASE NUMBER:

ALAN CISNEROS, a/k/a "Ghost;"
RICARDO JUAREZ, a/k/a/ "Caballo;"
ANDRES GARCIA;
CHRISTIAN RAMIREZ, a/k/a "Locs;"
FAUSTINO MORALES, a/k/a "Doughboy;"
JAVIER ABEJA, a/k/a "Vicious;"
ALEJANDRO CABRERA;
FERNANDO LLANES;
ERNESTO ROSALES; and
DIANA CISNEROS

SEP 11 2012
*Sep 11 2012*
THOMAS G BRUTON
CLERK, U S DISTRICT COURT

## 12CR0709

**UNDER SEAL**

MAGISTRATE JUDGE KEYS

I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief:

### COUNT ONE

Beginning no later than in or about November 2011 and continuing until at least on or about May 7, 2012, in the Northern District of Illinois, Eastern Division, and elsewhere, ALAN CISNEROS, a/k/a "Ghost," CHRISTIAN RAMIREZ, a/k/a "Locs," FAUSTINO MORALES, a/k/a "Doughboy," JAVIER ABEJA, a/k/a "Vicious," ALEJANDRO CABRERA, FERNANDO LLANES, ERNESTO ROSALES, and DIANA CISNEROS, defendants herein, did conspire with each other, and with others known and unknown, to knowingly and intentionally possess with intent to distribute and to distribute a controlled substance, namely, 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(l), all in violation of Title 21, United States Code, Section 846.

### COUNT TWO

On or about March 1, 2012, in the Northern District of Illinois, Eastern Division, RICARDO JUAREZ, a/k/a "Caballo," defendant herein, did knowingly and intentionally distribute a controlled substance, namely, 500 grams or more of a mixture and substance containing detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

## COUNT THREE

On or about April 17, 2012, in the Northern District of Illinois, Eastern Division, ANDRES GARCIA, defendant herein, did knowingly and intentionally distribute a controlled substance, namely, 500 grams or more of a mixture and substance containing detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841 (a)(1).

I further state that I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives, and

that this complaint is based on the facts contained in the Affidavit which is attached hereto and incorporated herein.


Signature of Complainant
JEFF SISTO
Special Agent, ATF

Sworn to before me and subscribed in my presence,

September 11, 2012          at    Chicago, Illinois
Date                                    City and State

ARLANDER KEYS, U.S. Magistrate Judge
Name & Title of Judicial Officer         Signature of Judicial Officer

2

STATE OF ILLINOIS         )
                             )     SS

COUNTY OF COOK        )

## **AFFIDAVIT**

I, Jeff Sisto, having been duly sworn under oath, state as follows:

## I.    **PRELIMINARY MATTERS**

1.     I am a Special Agent with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives and have been so employed for more than thirteen years. Prior to that, I was a Border Patrol Agent with the United States Department of Justice, Immigration and Naturalization Service, United States Border Patrol for two and one half years. I am currently assigned to the ATF Chicago Field Division in Downers Grove, Illinois.

2.     Since becoming a Special Agent with ATF, my duties have included investigating criminal violations of federal narcotics laws, including, but not limited to, Title 21, United States Code, Sections 841(a)(1), 843(b) and 846; along with violations of Title 18, United States Code, Section 922 (federal firearms violations). In addition, I have been involved in various types of electronic surveillance (including the interception of wire communications) and the debriefing of defendants, witnesses, and informants, as well as others who have knowledge of the distribution and transportation of controlled substances. Through my training, education, and experience, I have become familiar with the manner in which illegal narcotics and firearms are transported, stored, and distributed and the methods

1

of payment for those narcotics and illegal firearms.

3.     I am the co-case agent on a joint Department of Homeland Security, United States Immigration and Customs Enforcement, Homeland Security Investigations ("HSI"), ATF investigation involving ALAN CISNEROS and others. As co-case agent, among other things, I monitored wire communications pursuant to this Court's orders, conducted surveillance as part of the investigation, and have interviewed subjects.

4.     The statements contained in this Affidavit are based on: (a) my personal participation in this investigation; (b) information provided by other federal, state, and local law enforcement officers; (c) surveillance conducted by HSI and ATF agents and other law enforcement officers; (d) analyses of toll records, pen register and trap and trace data, and subscriber information; (e) information derived from consensually-recorded telephone conversations; (f) review of conversations intercepted pursuant to court orders; (g) my training and experience and the training and experience of other law enforcement agents; (h) laboratory analysis reports; (i) reports of telephone record, pen register, and trap and trace analyses; (j) commercial database records; (k) records of the Illinois Secretary of State ("SOS"); and (m) information provided by cooperating sources ("CS") and other individuals.

5.     This affidavit is made in support of an three-count criminal complaint charging that:

a.     Beginning no later than in or about November 2011 and continuing until at least on or about May 7, 2012, ALAN CISNEROS, CHRISTIAN RAMIREZ,

2

FAUSTINO MORALES, JAVIER ABEJA, ALEJANDRO CABRERA, FERNANDO LLANES, ERNESTO ROSALES, and DIANA CISNEROS, did conspire with each other, and with others known and unknown, to knowingly and intentionally possess with intent to distribute and to distribute a controlled substance, namely, 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(l), all in violation of Title 21, United States Code, Section 846.

b.     On or about March 1, 2012, RICARDO JUAREZ knowingly and intentionally distributed a controlled substance, namely, 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

c.     On or about April 17, 2012, ANDRES GARCIA knowingly and intentionally distributed a controlled substance, namely 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

6.     The recitation of facts contained in this Affidavit is not meant to be a complete narrative of all that has occurred in connection with this investigation, but is only a summary of facts necessary to show probable cause to support the charges as set forth herein.

3

## II.    **BACKGROUND OF THE INVESTIGATION**

7.    This complaint is based on an investigation conducted by ATF and HSI into the drug trafficking and related criminal activities involving ALAN CISNEROS, his co-conspirators, and suppliers.

8.    The information supporting probable cause set forth below is primarily based on the following:

a.    Information derived from consensually-recorded telephone conversations between CISNEROS and an undercover agent ("UCA") and confidential sources;

b.    Information derived from the use of court-authorized[1] interceptions of conversations over cellular telephones used by CISNEROS, including the cellular telephones bearing the numbers 773-569-6161 (Target Phone 2), 773-516-7326 (Target Phone 3), and 708 335-7361 (Target Phone 6).

c.    Narcotics seizures by law enforcement, including the seizures identified in the chart on pages 7 through 10 below.

d.    Narcotics proceeds seizures by law enforcement, including the seizure of approximately $2,053 in U.S. currency on May 9, 2012.

---

[1]    At various times between February 3, 2012 and April 12, 2012, ATF/HSI intercepted telephone conversations over Target Phones 2, 3, and 6, which were used by CISNEROS, pursuant to interception orders signed by the Chief Judge or the Acting Chief Judge for the United States District Court for the Northern District of Illinois. The call summaries in the Affidavit that include a "session" number refer to telephone calls that were intercepted pursuant to one of the above-referenced court orders.

9.      This Affidavit is organized as follows:  Section III (A) sets out an overview of the Alan Cisneros drug trafficking organization; Section III (B) sets out the roles of the various defendants and a brief description of each defendant's role(s) in the crimes; and Section IV sets out the facts establishing probable cause.

## III.    ROLES OF THE DEFENDANTS

### A.      The CISNEROS DTO

10.     ALAN CISNEROS (hereinafter, "CISNEROS") is the leader of a drug trafficking organization based in Summit, Illinois ("CISNEROS DTO").  From beginning no later than in or about November 2011 and continuing until at least on or about May 7, 2012, the CISNEROS DTO obtained multi-kilogram quantities of cocaine from suppliers such as ANDRES GARCIA, RICARDO JUAREZ, and others, and distributed the cocaine to its customers.  CHRISTIAN RAMIREZ is a narcotics distributor, and served as a manager of the CISNEROS DTO.  As a manager of the CISNEROS DTO, CHRISTIAN RAMIREZ assisted CISNEROS by dealing directly with drug suppliers on CISNEROS' behalf, and by obtaining, preparing, and storing cocaine prior to its distribution to CISNEROS DTO workers and drug customers.   RAMIREZ also distributed quantities of cocaine to CISNEROS DTO workers and drug customers, and collected narcotics proceeds from workers, narcotics distributors, and drug customers. RAMIREZ further stored and delivered narcotics proceeds on the CISNEROS DTO's behalf.  FAUSTINO MORALES, JAVIER ABEJA, ALEJANDRO CABRERA, FERNANDO LLANES, ERNESTO ROSALES, and

others (hereinafter, "CISNEROS DTO workers") were narcotics distributors and served as workers for the CISNEROS DTO. CISNEROS fronted quantities of cocaine to the CISNEROS DTO workers. The CISNEROS DTO workers also performed one or more of the following tasks: distributing cocaine to CISNEROS DTO drug customers on CISNEROS' behalf, delivering cocaine or narcotics proceeds to CISNEROS or RAMIREZ, preparing cocaine to be sold to customers, storing cocaine and narcotics proceeds, and conducting counter-surveillance. Additionally, JAVIER ABEJA and FERNANDO LLANES brokered purchases of cocaine from suppliers. DIANA CISNEROS was a worker for the CISNEROS DTO, and assisted CISNEROS with storing and delivering narcotics and narcotics proceeds, and conducting counter-surveillance.

**B.     Roles of the Defendants**

11.     The following is a brief summary of the roles played by the defendants:

a.     ALAN CISNEROS (a/k/a "Ghost") is a high ranking member of the Almighty Latin King Nation (a/k/a "The Latin Kings" and hereinafter, "ALKN"). CISNEROS was the leader of the CISNEROS DTO, and distributed illegal narcotics to wholesale customers and various ALKN members in Summit and its surrounding area.[2] As the leader of the CISNEROS DTO, CISNEROS, in

---

[2] Based on my training and experience, as well as information I've received from other law enforcement officers, the ALKN is a violent, well organized street gang, controlled through a hierarchical system. The ALKN gang members active within Chicago and its suburbs are organized by geographic locations called Regions. Each Region is an umbrella title for the gang members who operate within that geographic area. Each ALKN Region is subdivided into "Chapters," or "Sections." There are multiple Regions located within Chicago and surrounding suburbs, one of

summary: 1) negotiated directly, and through other members of the CISNEROS DTO, with suppliers such as ANDRES GARCIA, RICARDO JUAREZ, and others, to obtain multi-kilogram quantities of cocaine; 2) distributed and supervised the distribution of cocaine to workers in the CISNEROS DTO and to CISNEROS DTO drug customers; 3) collected and supervised the collection of narcotics proceeds from workers and customers of the CISNEROS DTO; and 4) stored and arranged for workers of the DTO to prepare and store cocaine and narcotics proceeds at various locations. The following table sets forth the criminal acts in which CISNEROS and other members of the CISNEROS DTO participated that are included in this affidavit:

| Date | Seller | Buyer | Drug Type/ Amount | Assisting Seller | Assisting Buyer |
|---|---|---|---|---|---|
| 5/13/10 | Llanes | CS3 | 56 grams of cocaine | | |
| 5/27/10 | Llanes | CS3 | one-eighth kilogram of cocaine | | |
| 8/25/11 | Cisneros | UCA | 13.1 grams of cocaine | | |

---

which is the Midwest Region. Each Region is controlled by a Regional Leader. CISNEROS was the Regional Leader, or Regional Officer for the Midwest Region until his arrest in May, 2012. The ALKN is involved with the importation of cocaine from other parts of the country and/or Mexico and distributing that cocaine among members of their own gang as well as persons not affiliated with the ALKN.

| | | | | | |
|---|---|---|---|---|---|
| 9/7/11 | Cisneros | UCA | 27.9 grams of cocaine | | |
| 9/16/11 | Cisneros | UCA | 124.7 grams of cocaine | | |
| 10/4/11 | Cisneros | UCA | 264 grams of cocaine | | |
| 10/20/11 | Cisneros | UCA | 127 grams of cocaine | | |
| 11/21/11 | Cisneros | UCA | 127 grams of cocaine | Ramirez | |
| 12/20/11 | Cisneros | UCA | 128 grams of cocaine | Ramirez | |
| 2/7/12 | Juarez | Cisneros | 500 grams of cocaine | | Ramirez Morales Cabrera Llanes Rosales Individual B |
| 2/9/12 | Cisneros | UCA | 500.8 grams of cocaine | Ramirez Morales | |
| 2/9/12 | Cisneros | Individual C (drug customer) | a quantity of cocaine | | |
| 2/15/12 | Cisneros | Drug Customer | a quantity of cocaine | Diana Cisneros | |
| 2/16/12 | Juarez | Cisneros | 500 grams of cocaine | | Ramirez Morales Cabrera Llanes Rosales Diana Cisneros |

| 3/1/12 | Juarez | Cisneros | 500 grams of cocaine | | Ramirez Llanes |
|---|---|---|---|---|---|
| 3/8/12 | Cisneros | Drug Customer | 12 Ounces | Cabrera Llanes | |
| 3/19-20/12 | Cisneros | Drug Customer | a quantity of cocaine (154.1 grams seized from Rosales) | Ramirez Cabrera Rosales | |
| 3/27/12 | Garcia | Cisneros | a quantity of cocaine | | Ramirez |
| 3/27/12 | Cisneros | UCA | 125 grams cocaine | Ramirez | |
| 4/13/12 | Garcia | Cisneros | a quantity of cocaine | | Ramirez |
| 4/17/12 | Juarez | Cisneros | a fourth-kilogram of cocaine | | Ramirez Morales Abeja Individual C |
| 4/17/12 | Garcia | Cisneros | 1 kilogram of cocaine | | Ramirez Morales Cabrera Llanes Diana Cisneros |
| 4/24/12 | Cisneros | Individual C and a drug customer | 2 ounces of cocaine 2 ounces of cocaine | Ramirez Morales | |

9

| 4/27-5/3/12 | Garcia | Cisneros | attempted purchase of a kilogram of cocaine | | Ramirez Diana Cisneros |
|---|---|---|---|---|---|
| 5/6/12 | Drug Supplier | Cisneros | attempted purchase of a half kilogram of cocaine | | Ramirez Abeja |
| 5/7/12 | Drug Supplier | Cisneros | 17 ounces of cocaine | | Ramirez Morales Cabrera Abeja Diana Cisneros |

b.     RICARDO JUAREZ (a/k/a "Caballo")("JUAREZ") is a Latin King street gang member, and was a cocaine source of supply for the CISNEROS DTO. JUAREZ provided the CISNEROS DTO with multi-kilogram quantities of cocaine. The criminal acts in which JUAREZ participated are summarized in the above chart.

c.     ANDRES GARCIA ("GARCIA") was a cocaine source of supply for the CISNEROS DTO, and provided the CISNEROS DTO with multi-kilogram quantities of cocaine. The criminal acts in which GARCIA participated are summarized in the above chart.

d.     CHRISTIAN RAMIREZ (a/k/a "LOCS") ("RAMIREZ") is a Latin King street gang member, a narcotics distributor, and a manager of the CISNEROS DTO.

10

As a manager of the CISNEROS DTO, CHRISTIAN RAMIREZ assisted CISNEROS by dealing directly with drug suppliers on CISNEROS' behalf, and by obtaining, preparing, and storing cocaine prior to its distribution to CISNEROS DTO workers and drug customers. RAMIREZ also distributed quantities of cocaine to CISNEROS DTO workers and drug customers, and collected narcotics proceeds from workers, narcotics distributors, and drug customers. RAMIREZ further stored and delivered narcotics proceeds on the CISNEROS DTO's behalf. The criminal acts in which RAMIREZ participated are summarized in the above chart.

e.   FAUSTINO MORALES (a/k/a "Doughboy") ("MORALES") is a Latin King street gang member, a narcotics distributor, and a worker in the CISNEROS DTO. MORALES was fronted cocaine by CISNEROS for distribution to retail customers. MORALES also assisted the CISNEROS DTO by conducting counter-surveillance, distributing cocaine directly to drug customers on CISNEROS' behalf, and by delivering cocaine or narcotics proceeds. MORALES further assisted the CISNEROS DTO by utilizing his residence to store cocaine and to prepare it for distribution to other workers in the CISNEROS DTO, narcotics distributors, and drug customers. The criminal acts in which MORALES participated are summarized in the above chart.

f.   JAVIER ABEJA (a/k/a "Vicious") is a Latin King street gang member, a

11

narcotics distributor, and a worker in the CISNEROS DTO. ABEJA was fronted cocaine by CISNEROS for distribution to retail customers. ABEJA also assisted the CISNEROS DTO by distributing cocaine directly to drug customers on CISNEROS' behalf, delivering cocaine or narcotics proceeds to CISNEROS or other members of the DTO, and by brokering purchases of cocaine from suppliers. The criminal acts in which ABEJA participated are summarized in the above chart.

g. ALEJANDRO CABRERA ("CABRERA") is a Latin King street gang member, a narcotics distributor, and a worker in the CISNEROS DTO. CABRERA was fronted cocaine by CISNEROS for distribution to retail customers. CABRERA also assisted the CISNEROS DTO by distributing cocaine directly to drug customers on CISNEROS' behalf, delivering cocaine or narcotics proceeds, and transporting CISNEROS as he conducted many of his illegal activities. The criminal acts in which CABRERA participated are summarized in the above chart.

h. FERNANDO LLANES ("LLANES") is a Latin King street gang member, narcotics distributor, and a worker in the CISNEROS DTO. LLANES was fronted cocaine by CISNEROS for distribution to retail customers. LLANES also assisted the CISNEROS DTO by delivering cocaine or narcotics proceeds, utilizing his residence to store and prepare cocaine for distribution to workers

12

in the CISNEROS DTO, narcotics distributors, and drug customers, and by brokering purchases of cocaine from suppliers. The criminal events in which LLANES participated are summarized in the above chart.

i.  ERNESTO ROSALES ("ROSALES") is a Latin King street gang member, narcotics distributor, and a worker in the CISNEROS DTO. ROSALES was fronted cocaine by CISNEROS for distribution to retail customers. ROSALES also assisted the CISNEROS DTO by delivering cocaine or narcotics proceeds and by conducting counter-surveillance. The criminal events in which ROSALES participated are summarized in the above chart.

j.  DIANA CISNEROS is CISNEROS' spouse and a worker in the CISNEROS DTO. DIANA CISNEROS assisted the CISNEROS DTO by distributing cocaine to drug customers on CISNEROS' behalf, delivering cocaine or narcotics proceeds to CISNEROS and other CISNEROS DTO members, and by warning CISNEROS of police activity. The criminal events in which DIANA CISNEROS participated are summarized in the above chart.

## IV.  FACTS ESTABLISHING PROBABLE CAUSE

### A.  Information from a Confidential Source

12.  CS3 is an active member of the ALKN. ATF first came into contact with the CS3 in 2010, after CS3 was arrested for driving under the influence. CS3 agreed to provide ATF with historical information regarding drug trafficking activities in the Cook County,

13

Illinois, area, and to proactively cooperate with law enforcement in exchange for payment. Prior to the arrest described above, CS3 was convicted of possession of a firearm and cocaine, and aggravated unlawful use of a weapon, and was sentenced to time served and bootcamp. In mid 2009, CS3 was arrested for retail theft and possession of drug paraphernalia, and received four months' supervision. In the Spring of 2011, CS3 was arrested for manufacturing and delivery cocaine.

13.     Between the time that CS3 began working with ATF in 2010 and the Spring of 2011, CS3 cooperated on drug investigations, which resulted in arrests, as well as seizures of guns and narcotics.[3] The information provided by CS3 during this investigation has been reliable. Moreover, the information provided by CS3 has been corroborated by independently obtained evidence, including physical surveillance, controlled purchases of narcotics, information from other confidential informants, recorded conversations, and public source database searches. In exchange for this cooperation, ATF and local law enforcement paid CS3 approximately $300.

14.     According to CS3, LLANES was a Latin King from Summit, Illinois who was a narcotics distributor. CS3 was familiar with LLANES through CS3's membership in the ALKN.

---

[3] CS3 is no longer an active source for ATF.

14

**B.** **CS3 Purchases Approximately 56 Grams of Cocaine from LLANES (May 13, 2010).**

15.     On May 13, 2010 at approximately 8:15 p.m., CS3, while in the presence of law enforcement officers, contacted LLANES, who was using phone number (708) 372-8861.[4] During the consensually-recorded phone call, LLANES arranged to sell CS3 a quantity of cocaine.[5]

---

[4] The identification of LLANES and LLANES' voice in this Affidavit is based upon the following: On or about February 12, 2012, CISNEROS was arrested by officers of the Summit Police Department for disorderly conduct. According to one of the arresting officers, who had previously arrested, observed, and spoken with LLANES on numerous occasions, LLANES was with CISNEROS at the time of CISNEROS' arrest. The same officer further advised that no one else was with CISNEROS at the time of his arrest. After CISNEROS' release later that day, CISNEROS, who was using Target Phone 3, had a conversation with MORALES. During this conversation, CISNEROS asked for "Fern's" telephone number, and MORALES provided the number for LLANES Phone 1. Based on information provided by the aforementioned Summit Police Department officer, "Fern" is LLANES's nickname and is short for Fernando. Later that day[TP3 Session # 986], CISNEROS, who was using Target Phone 3, had a conversation with a man (believed to be LLANES), who was using a telephone assigned number (773) 850-5059 (Llanes Phone 2). During that call, the man using Llanes Phone 2 stated that he was with CISNEROS at the time of his arrest earlier that day. Agents have compared the voice of the man who was using Llanes Phone 1 to the voice of the man using Llanes Phone 2 and believe that the same man (LLANES) is using both phones. Agents have compared the voices of subsequent phones being used by LLANES and have determined that the individual utilizing those phones was also LLANES. I compared the voices on Llanes Phones 1 and 2 to Llanes Phone 3 and they are the same voice.

[5] Some of the consensually-recorded and intercepted conversations (hereinafter "recorded conversations") have been summarized in this Affidavit. The language that is quoted from the recorded conversations throughout this Affidavit is based upon a preliminary review of the recorded conversations, and not final transcripts of the recorded conversations. The times listed for the recorded conversations are approximate. The summaries do not include all statements or topics covered during the course of the recorded conversations. At various points in the Affidavit I have included in brackets my interpretation of words and phrases used in the recorded conversations. My interpretations are based on my familiarity with this case, as set forth above. The intercepted conversations contained herein are both in the Spanish and English languages. For the intercepted conversations that are in the Spanish language, I have at times relied on draft– not final– English translations of the conversations in Spanish done by ATF/HSI agents and/or interpreters contracted by ATF/HSI.

15

16.     Law enforcement officers outfitted CS3 and CS3's vehicle with audio and video recording devices, provided CS3 with $1,900 in buy money, and searched CS3 for contraband and money with negative results. At approximately 8:20 p.m., surveillance followed CS3 to Summit, Illinois where CS3 had arranged to meet LLANES. While CS3 was driving to Summit, CS3 and LLANES exchanged a series of calls. During one of the calls, LLANES instructed CS3 to drive to CISNEROS's house to pick up LLANES so that they could then drive around the block.[6]

17.     At approximately 8:35 p.m., CS3 called LLANES at the same phone number listed above, and asked LLANES where he was located. Surveillance followed CS3 as he drove to meet LLANES at Cisneros Residence 1. At approximately 8:37 p.m., surveillance observed LLANES enter CS3's vehicle. During the consensually-recorded, in-person meeting, CS3 requested to purchase four and one-half ounces of cocaine from LLANES. During the meeting, as heard on the audio recording, CS3 stated, "How much are you going to give it [cocaine] to me for?" LLANES stated, "For which one [the quality of cocaine]?" CS3 stated, "regular [a type of cocaine]." LLANES stated, "1450 +1450 is 28, 29, plus the half, is 22 or 32 I mean [a total of $3,200]." CS3 stated, "Ok, can't you do less [can LLANES sell the cocaine to CS3 for a lessor amount]?" LLANES stated, "I can't do it. If I could do it, I would do it." According to the audio and video recording, LLANES told CS3 to contact him in approximately one hour, and LLANES would tell CS3 at that time if he

_____

[6] Because CS3 was driving at the time of the calls, only CS3's side of the calls was recorded.

would be able to obtain four and one-half ounces of cocaine sell to CS3. At approximately 8:43 p.m., surveillance observed LLANES exit CS3's vehicle, and followed CS3 to the prearranged meeting location.

18.     At approximately 9:02 p.m., while in the presence of law enforcement, CS3 placed a consensually-recorded call to LLANES. During the call, LLANES stated that he only had "2 [two ounces of cocaine]," but said that if CS3 agreed to wait, he [LLANES] would be able to obtain the full amount of cocaine (4 and one-half ounces) the next morning. CS3 told LLANES words to the effect that CS3 would call LLANES back.

19.     At approximately 9:05 p.m., while in the presence of law enforcement, CS3 placed a consensually-recorded telephone call to LLANES. During the recorded call, CS3 told LLANES that he would purchase the 2 ounces of cocaine, and made arrangements to meet LLANES a short time later that evening.

20.     At approximately 9:24 p.m., surveillance followed CS3 to the vicinity of 61st Street and 75th Avenue next to a grocery store in Summit, Illinois, where CS3 had arranged to meet LLANES. At approximately 9:31 p.m., surveillance observed CS3 arrive in Summit, Illinois, and at approximately 9:36 p.m., CS3 placed a consensually-recorded call to LLANES and told LLANES that he/she had arrived at the grocery store.

21.     At approximately 9:42 p.m., surveillance observed LLANES enter CS3's vehicle and meet with CS3. As heard on the recording, LLANES instructed CS3 to drive.

17

LLANES then sold CS3 two ounces of cocaine for $1,900.[7]   Surveillance then observed

LLANES exit CS3's vehicle, and followed CS3 to the prearranged meeting site.

22.   CS3 met with law enforcement officers, who debriefed CS3, and searched CS3

for contraband and money with negative results.  Law enforcement officers then took

possession of the clear, plastic bag that containing an off white, chunky substance that CS3

reported LLANES had sold to him/her in exchange for $1,900.

23.   Agents subsequently submitted the substance to the Illinois State Police

Laboratory (hereinafter, "ISP lab") for analysis, which determined that the substance

weighed approximately 55.5 grams and contained Cocaine Hydrochloride.

**C.   CS3 Purchases Approximately 124 grams of Cocaine from LLANES (May 27, 2010).**

24.   On May 27, 2010, at approximately 9:54 p.m., CS3, while in the presence of

law enforcement officers, placed a consensually-recorded call to LLANES, who was using

(708) 372-8861, to arrange to purchase a one-eighth kilogram-quantity of cocaine from

LLANES. At approximately 9:54 p.m., CS3 stated, "You ready for me or what [ready to sell

CS3 cocaine]?  I'm right..."  LLANES stated, "Yeah."  CS3 stated, "I'm right here past

LaGrange on 55." LLANES stated, "I think there's a road block on Archer." CS3 stated, "A

road block on Archer?  I'll go back around through Harlem then."  LLANES stated, "Cool."

CS3 then confirmed that LLANES wanted him/her to drive to the same grocery store at

---

[7] LLANES is seen in the video recording inside of the vehicle but the video did not capture
LLANES handing CS3 the cocaine.

18

which they previously met, and LLANES affirmed.

25.     Law enforcement officers outfitted CS3 and CS3's vehicle with audio and video recording devices, searched CS3 for contraband and money with negative results, and gave CS3 $4,100 in buy money.

26.     Surveillance followed CS3 to Summit, Illinois, and at approximately 10:05 p.m., CS3 placed a consensually-recorded call to LLANES to ask where LLANES was located. At approximately 10:06 p.m., surveillance observed CS3 park his/her vehicle near the grocery store, where, according to CS3, LLANES had instructed him/her to wait.

27.     At approximately 10:15 p.m., surveillance observed LLANES, walking near the grocery store. At approximately that same time, CS3 placed a consensually-recorded call to LLANES, and told LLANES that he/she was parked in the middle of the block.[8] CS3 stated, "You don't see me? Ok, I'm gonna go back, I'll be right there." Surveillance then observed CS3 pull out, and at approximately 10:17 p.m., observed LLANES enter CS3's vehicle.

28.     During the recorded in-person meeting, LLANES sold CS3 approximately four and one-half ounces of cocaine in exchange for $4,100.[9]

29.     At approximately 10:22 p.m., surveillance observed LLANES leave CS3's

---

[8]   Only CS3's side of the conversation was captured on the recording because CS3 was in the car.

[9]   The video recording captured LLANES inside of the vehicle but did not show LLANES handing the cocaine to CS3.

19

vehicle, and CS3 departed the area. Surveillance followed CS3 to a prearranged location. Law enforcement officers debriefed CS3, searched CS3 for contraband and money with negative results, and took possession of a clear, plastic bag that contained an off-white chunky substance that appeared to be cocaine.

30.     Agents subsequently submitted the substance to the ISP lab for analysis, which determined that the substance weighed approximately 124.2 grams and contained Cocaine Hydrochloride.

**D.     CISNEROS Sells the UCA Approximately 13.1 Grams of Cocaine (August 25, 2011).**

31.     On August 25, 2011, at approximately 3:15 p.m., the UCA placed a consensually-recorded call to CISNEROS on Target Phone 2.[10] During the call, the UCA stated, "I talked to you about [selling] those Newports [cigarettes]. I got those, how many you want?" CISNEROS responded, "What's the number [purchase price]?" The UCA stated, "It's 35 [dollars] a carton." CISNEROS stated, "Alright, just run 10 [cartons of cigarettes], yeah 10's fine." The UCA asked, "10 [cartons], can I get some work [cocaine] on that [in

---

[10]     The identification of CISNEROS and CISNEROS' voice in this affidavit is based on the following: On June 29, 2012, the UCA and a confidential source ("CS") were inside a bar in Summit, Illinois. The UCA and the CS introduced themselves to two Latin King subjects who were seated at a table in the corner of the bar. The UCA and CS performed the Latin King handshake with both individuals, one of whom identified himself as "Ghost." The UCA positively identified Ghost as CISNEROS from arrest photographs of CISNEROS that he viewed in the past. Additionally, on May 7, 2012, law enforcement officers arrested CISNEROS, and he identified himself as Alan Cisneros, and he is the same person the UCA met in person and who was seen on numerous occasions on surveillance. The UCA has met CISNEROS in person on many occasions and has compared the voice of the person he met with the voice on the consensual recordings and Target Phones identified in this affidavit, and it is the same voice.

exchange for the cigarettes]?" CISNEROS responded, "Yeah." The UCA asked, "Yeah, about half [an ounce of cocaine]?" CISNEROS responded, "Yeah." CISNEROS later stated, "Alright, cool. You might as well give me, why don't you give me 12 [cartons of cigarettes] then, you know." CISNEROS and the UCA then arranged to meet each other later that day. Based on the calls set forth above and my knowledge of the investigation as a whole, and my training and experience as a Special Agent, I believe that CISNEROS in this call agreed to sell the UCA approximately a half-ounce of cocaine in exchange for twelve cartons of cigarettes.

32.     At approximately 4:33 p.m., the UCA placed another consensually-recorded call to CISNEROS, who was using Target Phone 2. During the call, CISNEROS gave the UCA directions to meet him in an alley behind 7432 W. 61st Street (hereinafter, "Cisneros Residence 1").[11]

33.     At approximately 4:37 p.m., the UCA met with CISNEROS in an alley behind Cisneros Residence 1. Before this meeting, the UCA was outfitted with a concealed audio recording device, and the UCA's car was equipped with video devices.

34.     During this meeting, CISNEROS told the UCA that he wanted 12 cartons of "Newport Shorts." The UCA replied that he only had Newport 100's cigarettes. CISNEROS responded that because the UCA did not have the brand he wanted, the deal would now be

_____

[11]  I believe that 7432 W. 61st, in Summit, Illinois is one of the residences associated with CISNEROS based on surveillance, and because CISNEROS asked the UCA to drop him off at home (Cisneros Residence 1) after one of their meetings.

13 cartons of cigarettes for the cocaine. Subsequently, the UCA gave CISNEROS 13 cartons of Newport 100s. CISNEROS then stated, "You wanted a halfsie [a half-ounce of cocaine]?" The UCA responded, "Yeah." CISNEROS then produced a plastic bag containing a white powdery substance that appeared to be cocaine, and exchanged it for the 13 cartons of cigarettes.

35.     After the deal was completed, the UCA traveled to a briefing location, where he met with ATF agents. Agents subsequently submitted the substance to the DEA North Central Laboratory (hereinafter, "DEA lab") for analysis, which determined that the substance weighed approximately 13.1 grams and contained Cocaine Hydrochloride.

**E.     CISNEROS Sells the UCA Approximately 27.9 Grams of Cocaine (September 7, 2011).**

36.     On or about September 6, 2011, at approximately 2:46 p.m., the UCA placed a consensually-recorded call to CISNEROS on Target Phone 2 to discuss the purchase of cocaine in exchange for cigarettes. During the call, the UCA told CISNEROS that he had some "shorts [Newport Cigarettes]" and asked CISNEROS whether he wanted to buy any. CISNEROS replied that he was at the hospital and that he would get back to him.

37.     On or about September 6, 2011, at approximately 8:20 p.m., the UCA exchanged text messages with CISNEROS, who was using Target Phone 2. During this exchange, CISNEROS stated, "U got some shorts [cigarettes] you said . . . I'd like 10 [cartons] or so." The UCA responded, "I'll trade you 12 [cartons]," meaning that the UCA was willing to trade 12 cartons of cigarettes in exchange for a half-ounce of cocaine.

22

38.     On or about September 7, 2011, at approximately 2:40 p.m., the UCA again exchanged text messages with CISNEROS, who was using Target Phone 2. During this exchange, the UCA asked, "U gonna be around for that [cocaine for cigarettes trade] today." CISNEROS responded that he was available to meet that day. At approximately 2:55 p.m., the UCA placed a consensually-recorded call to CISNEROS, who was using Target Phone 2, and asked, "How much extra money do I need to bring to get that whole one [one ounce of cocaine]." CISNEROS told the UCA to "just come out this way [near Cisneros Residence 1], I'll call you up right now, or text ya.'" At approximately 3:08 p.m., CISNEROS, who was using Target Phone 2, sent the UCA a text message, stating "380 [dollars]." The UCA understood CISNEROS to mean that CISNEROS was willing to sell the UCA a full ounce of cocaine in exchange for 12 cartons of cigarettes and $380.

39.     At approximately 4:23 p.m., the UCA had a telephone conversation with CISNEROS, who was using Target Phone 2. During the call, CISNEROS directed the UCA to meet him in an alley behind Cisneros Residence 1 (the same location where, on August 25, 2011, CISNEROS had sold the UCA approximately 13.1 grams of cocaine). At approximately 4:29 p.m., the UCA met with CISNEROS in the alley behind Cisneros Residence 1. Prior to the meeting, the UCA had been outfitted with a concealed audio recording device. During this meeting, the UCA handed CISNEROS 12 cartons of Newport cigarettes and $380. In exchange, CISNEROS handed the UCA a plastic bag containing 30 grams of a white powdery substance that appeared to be cocaine. During this meeting, the

23

UCA asked CISNEROS, "Let me know what you can do on four and a split [how much CISNEROS would charge to sell four and a half ounces of cocaine on a future date]." CISNEROS responded, "OK. It depends which one [quality of cocaine] you want." CISNEROS then asked the UCA whether he wanted "to do like this [buy the same quality of cocaine that the UCA had previously bought from CISNEROS] . . . or do you want the fire [higher quality cocaine]?" CISNEROS then added, "Fire you don't make no money," meaning that the UCA could make more money selling lower quality cocaine. The UCA responded that he wanted to continue to purchase the same quality of cocaine that he had bought previously.

40.     After the deal was completed, the UCA traveled to a briefing location where he met with law enforcement officers. The UCA gave the plastic bag that he received from CISNEROS to law enforcement officers. Agents subsequently submitted the substance to the DEA lab for analysis, which determined that the substance weighed approximately 27.9 grams and contained Cocaine Hydrochloride.

**F.     CISNEROS Sells the UCA Approximately 124.7 Grams of Cocaine (September 16, 2011).**

41.     On September 16, 2011, at approximately 12:13 p.m., the UCA exchanged text messages with CISNEROS, who was using Target Phone 2, and stated, "Yooooo u around." CISNEROS, who was using Target Phone 2, replied via text message, "Yea what time u wanna stop by." The UCA stated, "I'm grabbing something to eat in Romeoville right now..when I get done I head ur way....if that's cool." CISNEROS stated, "I gotta take my

24

shorty to the drs u wanna stop by around 4 or so." The UCA stated, "Yae that's cool just text me when u back around."

42. At approximately 4:03 p.m., the UCA exchanged text messages with CISNEROS, who was using Target Phone 2, stating, "U around." CISNEROS replied, "I'm on my way back. B there in bout 30." The UCA stated, "Cool I'm gonna start heading that way from Rville (Romeoville) then if that's cool." CISNEROS replied, "?" At approximately 4:19 p.m., the UCA called CISNEROS on Target Phone 2. During the call, the UCA stated, "Hey man, nah, what I'm saying is, I'm gonna start driving there from Romeoville so it will take me about thirty minutes from Romeoville with the traffic you know?" CISNEROS stated, "Uh ok, that's cool bro." The UCA stated, "That's cool? I'll just be around the area then, just text me when your ready for me to come through." CISNEROS stated, "All right, all right. Call me when your getting off at the exit." The UCA stated, "All right, coo, you just want me to come to the same spot then?" CISNEROS stated, "Yeah most likely, but yah, just call me just to make sure." CISNEROS stated, "All right." CISNEROS stated, "Or text me." The UCA affirmed.

43. At approximately 4:48 p.m., the UCA called CISNEROS on Target Phone 2. Only the UCA's end of this conversation was recorded because the UCA was en route to meet CISNEROS and did not have the capacity to record both sides of the call. During the call, the UCA stated, "You ready for me?" The UCA stated that CISNEROS said that he was ready. The UCA stated, "I just got off the highway, be there in a couple minutes." The

UCA, who was equipped with audio and video recording devices, then drove to the meeting location.

44.     At approximately 4:55 p.m., the UCA met with CISNEROS on the parking pad behind Cisneros Residence 1. During the meeting, CISNEROS stated, "Whats up bro." The UCA stated, "Whats up King?' CISNEROS stated, "This what you needed?" The UCA stated, "four and a split [four and one-half ounces of cocaine]." CISNEROS stated, "Damn, you need it right now. Oh, see I didn't even know that's what you wanted bro." The UCA stated, "Remember that day I told you, we talked about it?" CISNEROS stated, "Yah, yah, ummm." The UCA stated, "How much can I grab." CISNEROS stated, "My brother probably has a zone [an ounce] or something. Let me uh, let me uh, well give me a second. Let me holler at this gut right here." The UCA stated, "All right, cool."

45.     CISNEROS walked away from the UCA vehicle then returned. CISNEROS stated, "Yah, give me a half hour." The UCA stated, "Half hour?" CISNEROS stated, "You wanna go grab something to eat?" The UCA stated, "Yeah let me know, call me, I'm gonna stick around for a little bit." CISNEROS stated, "Give me a half hour tops." The UCA stated, "How much you gonna get?" CISNEROS stated, "The four and a half [four and one-half ounces]." The UCA stated, "You'll get the 4 and a half  Cool. Cool." CISNEROS stated, " I'll give you two right now." The UCA stated, "Two right now?  Ah fuck, is it for sure a half hour?" CISNEROS stated, "Yeah." The UCA then departed the location.

46.     At approximately 5:34 p.m., CISNEROS, who was using Target Phone 2,

26

exchanged text messages with the UCA. CISNEROS stated, "Where u by." The UCA stated, "I'm on 47th mr sub." CISNEROS stated, "Ready." CISNEROS stated, "Cool ill be on my way then." The UCA, who was equipped with audio and video recording devices, traveled to Cisneros Residence 1.

47.     At approximately 5:49 p.m., the UCA met with CISNEROS inside of the garage located behind 7434 W. 61st Street, in Summit, Illinois (which is next door to Cisneros Residence 1). During the meeting, the UCA stated, "What you got homey?" CISNEROS stated, "It's gonna be a little bit cheaper for this one." The UCA stated, "Okay." CISNEROS stated, "Yah." The UCA stated, "How much is that?" CISNEROS stated, "Thirty two." The UCA stated, "thirty-two hundred?" CISNEROS stated, "Yah." The UCA then counted out $3,200, gave the money to CISNEROS, and departed the location.

48.     Following the meeting, agents met with the UCA at a prearranged debriefing location, and the UCA provided agents a plastic bag containing on127 grams of suspect cocaine.

49.     Agents subsequently submitted the substance to the DEA lab for analysis, which determined that the substance weighed approximately 124.7 grams and contained Cocaine Hydrochloride.

**G.      CISNEROS Sells the UCA Approximately 264 Grams of Cocaine (October 4, 2011).**

50.     On October 3, 2011, at approximately 4:39 p.m., the UCA had a consensually-recorded telephone conversation with CISNEROS, who was using Target Phone 2. During

27

the call, the UCA stated, "Hey, I was wondering if we could double up from what we did last time [9 ounces of cocaine referring to the September 16, 2011 transaction]?" CISNEROS stated, "Yeah, that's cool bro." The UCA stated, "Yah, you wanna shoot me a number on that?" CISNEROS stated, "Yeah, I'll give you a call give you a text right now." The UCA stated, "All right, cool dog." CISNEROS stated, "All right, bye." At approximately 4:44 p.m., the UCA received an incoming text message from CISNEROS on Target Phone 1 stating, "61 [$6,100"]." The UCA and CISNEROS exchanged text messages and agree to meet the following day.

51. On October 4, 2001, beginning at approximately 3:14 p.m., CISNEROS, who was using Target Phone 2, exchanged text messages with the UCA. The UCA stated, "U gonna be around." CISNEROS asked what time the UCA was available. The UCA stated, "Like 30 - 40 minutes….. if that's cool….." The UCA stated, "Is that good or no." CISNEROS stated, "Yea bout 30 or so?" The UCA stated, "Cool cool,,,,ill call ya when I get close…." CISNEROS stated, "K."

52. At approximately 5:00 p.m., CISNEROS sent the UCA another text message stating, "How long." The UCA stated, "I'm around now just tell me where bro." CISNEROS stated, "Same ok." CISNEROS then stated, "Place." The UCA stated, "Yea I'm leaving the Burger King now." CISNEROS stated, "K." At approximately 5:11 p.m., the UCA stated, "I'm here bro."

53. At approximately 5:10 p.m., the UCA parked in the alley behind Cisneros

28

Residence 1, exited his vehicle, and met with CISNEROS in the garage behind 7434 W. 61st Street, Summit, Illinois. The UCA was equipped with audio and video recording devices. According to the UCA, CISNEROS possessed a plastic bag containing a quantity of cocaine. The UCA asked CISNEROS, "What you got there nine? [referring to 9 ounces of cocaine] My man." The UCA then stated, "There's sixty-one there homey [$6,100]." The UCA then purchased nine ounces of cocaine from CISNEROS for $6,100.

54.     Following the meeting, agents met with the UCA at a prearranged debriefing location, and the UCA provided agents a plastic bag containing two hundred sixty-four grams of suspect cocaine. Agents subsequently submitted the substance to the DEA lab analysis, which determined that the substance weighed approximately 250.3 grams and contained Cocaine Hydrochloride.

**H.     CISNEROS Sells the UCA Approximately 127 Grams of Cocaine (October 20, 2011).**

55.     On October 20, 2011, the UCA arranged to purchase four and a half ounces of cocaine from CISNEROS through a series of text messages. The messages were deleted inadvertently without being saved. At approximately 3:00 p.m., the UCA, who was equipped with an audio recording device, departed the briefing location to meet with CISNEROS.

56.     At approximately 3:09 p.m., the UCA's vehicle turn into the alley near Cisneros Residence 1. At approximately 3:14 p.m., the UCA spoke to CISNEROS by phone (the call was not recorded). According to the UCA, CISNEROS stated that he would be there in two minutes. At approximately 3:18 p.m., CISNEROS arrived in the alley near Cisneros

29

Residence 1, and met with the UCA. The UCA advised that he followed CISNEROS inside the garage behind 7434 W. 61st Street, Summit, Illinois.

57.     During the meeting, as set forth below, the UCA purchased four and a half ounces of cocaine from CISNEROS for $3,200. CISNEROS stated, "Here you go." The UCA stated, "All right, cool." CISNEROS stated, "You got somewhere to put it?" The UCA replied, "I got a spot." The UCA stated, "Hey, uh, shoot me a price on an eighteen [half kilogram of cocaine]." CISNEROS stated, "An eighteen, yah?" The UCA stated, "Maybe next week or the week after." CISNEROS stated, "okay, I gotta ask this guy first, see what he wants." The UCA stated, "Yeah, just let me know. That way I can make some money towards Las Vegas." CISNEROS stated, "Yeah." The UCA then departed the location.

58.     Following the meeting, the UCA provided agents a plastic bag containing 127 grams of suspect cocaine. Agents subsequently submitted the substance to the DEA lab for analysis, which determined that the substance weighed approximately 125.2 grams and contained Cocaine Hydrochloride.

**I.      The UCA and CISNEROS meet at Rivers Casino in Des Plaines, Illinois (November 3, 2011).**

59.     On or about November 3, 2011, the UCA and the CS met CISNEROS and CABRERA[12] at Rivers Casino in Des Plaines, Illinois.[13] According to the UCA, CISNEROS

_____

[12] The identification of CABRERA and CABRERA's voice in this Affidavit is based on the following: Surveillance agents identified CABRERA based on prior surveillance and their prior review of CABRERA's Illinois driver's license photo, which is maintained by the Illinois Secretary of State. The UCA has spoken in person to CABRERA on various occasions, and also took part in the February 7, 2012, surveillance and positively identified CABRERA based on his/her prior

talked at length about properties CISNEROS owned in Chicago Heights. CISNEROS informed the UCA that he met an Italian man who sold real estate in Chicago Heights through his "bullshit" carpet cleaning business. CISNEROS informed the UCA how Latin Kings from Chicago Heights were giving the real estate guy a hard time so the guy came to CISNEROS to get his help dealing with the ALKN. CISNEROS stated that for his help, the real estate salesman found properties for CISNEROS that were cheap so that CISNEROS could purchase them in cash. CISNEROS went on to say that he would invest $40,000 to 50,000 to rehabilitate the properties, and then have someone else seek a loan on his behalf for approximately $50,000. CISNEROS added that he rents the properties to pay the mortgage.

**J.    CISNEROS and RAMIREZ Sell the UCA Approximately 127 Grams of Cocaine (November 21, 2011).**

60.    On or about November 21, 2011, between approximately 11:38 a.m. and 12:11 p.m., the UCA exchanged a series of text messages with CISNEROS, who was using Target Phone 2. During this exchange of text messages, the UCA asked, "U still want those shorts [Newport cigarettes]." CISNEROS responded, "Let me find out I think they close Jackie's [a bar owned by a man to whom CISNEROS resells cigarettes] for 2 weeks." The UCA

---

interactions with CABRERA. The UCA also listened to T-III intercepted calls from Target Phones 2, 3 and 6 involving CABRERA using phone numbers 630-452-0928 and 630-670-0803. The UCA identified the voice on the calls as that of CABRERA.

[13]    This meeting was recorded, but due to the fact that it took place in a casino, it is difficult to hear portions of the recording.

31

stated, "Koo [cool] koo [cool] I need to come through [obtain cocaine for distribution to others] either way if ur gonna be around." CISNEROS responded, "Yea what time." CISNEROS and the UCA then arranged to meet later that day.

61.    Between approximately 2:08 p.m. and 2:21 p.m., the UCA exchanged another series of text messages with CISNEROS, who was using Target Phone 2. CISNEROS wrote, "32 [$3,200]." The UCA understood that CISNEROS was offering to sell him four and a half ounces of cocaine in exchange for $3,200. The UCA responded, "Yep." CISNEROS responded, "K [okay]." CISNEROS and the UCA then arranged a meeting for approximately 3:30 p.m. later that day.

62.    Between approximately 3:31 p.m. and 3:44 p.m., the UCA exchanged another series of text messages with CISNEROS, who was using Target Phone 2. CISNEROS wrote, "Auto zone by Harlem 60." The UCA understood CISNEROS to be referring to an Advance Auto Parts store located at 5942 S. Harlem Avenue, Summit, Illinois. At approximately 3:44 p.m., CISNEROS asked, "U there." The UCA responded, "Just pulled in."

63.    At approximately 3:46 p.m., the UCA met with RAMIREZ, in the parking lot of Advance Auto.[14] After the UCA arrived at the parking lot, RAMIREZ entered the the UCA's

---

[14] The identification of RAMIREZ and RAMIREZ's voice in this Affidavit is based on the following: The UCA had previously met RAMIREZ through CISNEROS. When the UCA and RAMIREZ first met, CISNEROS told the UCA that RAMIREZ was his (CISNEROS') brother. Following that introduction, agents showed the UCA photos that were taken of RAMIREZ in connection with a prior arrest, and the UCA positively identified RAMIREZ as the man who was introduced to him as CISNEROS' brother. The UCA also listened to T-III intercepted calls from Target Phones 2, 3 and 6 involving RAMIREZ using phone numbers 515-528-6359 and 316010151036450 (111*387*3282). The UCA identified the voice on the calls as that of

vehicle. Before this meeting, the UCA had been outfitted with a concealed audio recording device. RAMIREZ and the UCA then did the ALKN handshake. The UCA then gave RAMIREZ $3,200. In exchange, RAMIREZ gave the UCA a plastic bag containing a white powdery substance that appeared to be cocaine. The UCA then departed the location and drove to a briefing location to meet with law enforcement. A few minutes after the deal was over, at approximately 3:56 p.m., CISNEROS used Target Phone 2 to send the UCA a text message, asking, "U Koo [did you receive the cocaine]." At approximately 3:57 p.m., the UCA sent CISNEROS a text message at Target Phone 2, stating, "Real koo [cool] thnx bro."

64.     At the briefing location, the UCA gave the plastic bag containing the white powdery substance that he received from RAMIREZ to law enforcement. Agents conducted a field test of the substance. The substance weighed approximately 127 grams and tested positive for the presence of cocaine. Agents subsequently submitted the substance to the DEA lab for analysis, which determined that the substance weighed approximately 124.9 grams and contained Cocaine Hydrochloride.

**K.     CISNEROS and RAMIREZ Sell the UCA Approximately 128 Grams of Cocaine (December 20, 2011).**

65.     On or about December 14 and 15, 2011, CISNEROS, who was using Target Phone 3, exchanged a series of text messages with the UCA.[15] In one of these text messages,

---

RAMIREZ.

[15] These text messages were inadvertently deleted from the UCA's telephone without being saved or photographed. Toll records for the UCA's cellular telephone confirm that the UCA's phone was in contact with Target Phone 3 on these dates.

the UCA asked CISNEROS whether he had any cocaine available to sell, using words to the effect of, "Can I come through?" CISNEROS responded via text message from Target Phone 3, advising the UCA that he did have cocaine available to sell. CISNEROS and the UCA then arranged to meet each other in the days immediately following these texts.

66. On or about December 17, 2011, between approximately 3:11 p.m. and 3:45 p.m., the UCA exchanged a series of text messages with CISNEROS, who was using Target Phone 3. During this exchange of text messages, the UCA stated, "Hey bro I caught flu from my shortie can u hold that [cocaine that CISNEROS had for sale] down for me until I can get on the move tomorrow or Monday." CISNEROS responded, "Yea that's koo bro." The UCA then responded, "Thnx bro I'll hit ya up."

67. On December 19, 2011, between approximately 6:22 p.m. and 7:38 p.m., the UCA exchanged another series of text messages with CISNEROS, who was using Target Phone 3. During this exchange, the UCA asked, "Is around 830 or nine koo [to meet for cocaine purchase] I got my shortie now for a bit or first thing tomorrow it's up to u." CISNEROS responded, "830 is koo." The UCA later stated, "Just dropped my shortie off bro I'm gonna start heading ur way if that koo." CISNEROS responded, "Can see u tomorrow instead." The UCA stated, "Yea that's koo what time u thinking. The earlier the better for me bro." CISNEROS responded, "First thing in the am."

68. On or about December 20, 2011, between approximately 8:39 a.m. and 11:16 a.m., the UCA exchanged another series of text messages with CISNEROS, who was using

34

Target Phone 3. During this exchange, the UCA and CISNEROS arranged to meet later that day at 12:30 p.m. At approximately 12:28 p.m., the UCA sent a text message stating that he (the UCA) was "5 out [five minutes away from Summit, Illinois]." CISNEROS responded, "Just came by me [near Cisneros Residence 1, where CISNEROS has previously sold narcotics to UCA] instead." The UCA later responded, "I'm in alley [behind Cisneros Residence 1]."

69.     At approximately 12:30 p.m., toll records for Target Phone 3 reflect that Target Phone 3 contacted a phone bearing telephone number (515) 528-6359, subscribed to Tracfone at 8390 NW 25th Street, Doral, Florida 33122, and believed to be used by RAMIREZ ("Ramirez Phone 1").[16]

70.     At approximately 12:45 p.m., the UCA met with CISNEROS in the alley behind Cisneros Residence 1. Before the meeting, the UCA had been outfitted with a concealed audio recording device. During that meeting, CISNEROS entered the UCA vehicle and directed the UCA to drive to another address in Summit located at either 7503 or 7505 West 58th Street. As the UCA vehicle approached the address, CISNEROS used the push-to-talk feature of his cellular telephone to contact another individual, stating, "I'm right here, I'm outside, come outside."

71.     The UCA then observed RAMIREZ and Individual A exit either the 7503 or 7505 West 58th Street. CISNEROS directed the UCA to pull over. CISNEROS got out of the

---

[16] During a previous arrest by law enforcement, RAMIREZ provided officers with the telephone number of Ramirez Phone 1 as his telephone number.

35

car, and RAMIREZ got in. RAMIREZ then directed the UCA to drive down to the next block. During this meeting, the UCA gave RAMIREZ $2,700, and in exchange, RAMIREZ gave the UCA a plastic bag containing a white powdery substance that appeared to be cocaine. RAMIREZ then exited the UCA's vehicle, and the UCA departed the location. At approximately 12:56 p.m. the UCA sent CISNEROS a text message on Target Phone 3, "All good bro 55 south bound [leaving Summit] ..Thx."

72. The UCA then met with law enforcement officers at a briefing location, and handed them the plastic bag that he received from RAMIREZ. Agents subsequently submitted the substance to the DEA lab for analysis, which determined that the substance weighed approximately 125.5 grams and contained Cocaine Hydrochloride.

**L.      CISNEROS Arranges to Purchase a Half-Kilogram Quantity of Cocaine from JUAREZ, and Instructs RAMIREZ, MORALES, CABRERA, LLANES, ROSALES, and Individual B to Deliver Drug Proceeds so that CISNEROS can use the Proceeds to Purchase the Cocaine (February 7, 2012).**

73. As set forth below, between February 6 and 7, 2012, LLANES attempted to broker a cocaine deal from a cocaine supplier on CISNEROS' behalf, but ultimately CISNEROS agreed to purchase a half-kilogram quantity of cocaine from JUAREZ for $14,600. As set forth below, after CISNEROS arranged to purchase cocaine from JUAREZ, RAMIREZ, MORALES, CABRERA, LLANES, ROSALES, and Individual B agreed to assist CISNEROS by collecting or dropping off money to pay for the cocaine. RAMIREZ and ROSALES further assisted CISNEROS by conducting counter-surveillance during the

36

deal, and LLANES paid JUAREZ on CISNEROS' behalf for partially fronted cocaine after the deal.

74.     On or about February 6, 2012, at approximately 7:44 p.m. [TP3 Session 399], CISNEROS, who was using Target Phone 3, had a conversation with LLANES, who was using telephone number (773) 640-1916 ("Llanes Phone 1"). CISNEROS asked LLANES if he was "decent [meaning if he had sold his cocaine and had the money to give CISNEROS to purchase more cocaine]." LLANES stated he was "straight" and that LLANES had "one for you [meaning $1000 for CISNEROS]." LLANES stated his brother had the one, and that LLANES himself had "some [money] and another dude had some." LLANES stated, "We'll keep that money, ya know for uh, when buddy gets here [when the cocaine supplier arrives with the cocaine]."

75.     On February 6, 2012, at approximately 9:36 p.m. [TP3 Session #406], CISNEROS spoke with MORALES, who was using 316010169461731 ("Morales Phone 1").[17] CISNEROS asked MORALES if he had "anything around there [meaning money from

---

[17] The identification of MORALES and MORALES' voice in this Affidavit is based on the following: First, as set forth in this affidavit, MORALES used various phones to have conversations with CISNEROS, who was using Target Phones 2, 3 and 6, to arrange for the delivery of cocaine from CISNEROS. On May 7, at approximately 7:38 p.m., MORALES, using Morales Phone 2, had a conversation with CISNEROS on Target Phone 6. CISNEROS told MORALES to call him when he was outside of Cisneros Residence 3. At approximately 7:52 p.m., CISNEROS asked MORALES where he was located, and MORALES stated, "I'm going around dude. I'll swing by there, I'm going to swing around, I'm headed to the back. I'm heading to the back [the rear of Cisneros Residence 3]." At that time, surveillance observed MORALES circling the block in a dark blue Ford Escape being driven by a white female. At approximately 7:52 p.m. [TP6, Session #1982], CISNEROS had a conversation with MORALES, who was using Morales Phone 2. During the call, MORALES stated, "I'm outside your house dude." CISNEROS told MORALES, "Go to the Laundromat, I'll see you

previous cocaine sales]?"  MORALES told CISNEROS, "Of course, buddy.  Here, with money, there's everything [meaning he had money he owed CISNEROS from previous cocaine transactions]."

76.    At approximately 10:58 p.m. [TP3 Session 408], CISNEROS, who was using Target Phone 3, had a conversation with LLANES, who was using Llanes Phone 1. CISNEROS asked LLANES what was up, and LLANES explained he could not get a hold of his brother.  LLANES stated that he "got like a good four something on me, four something [meaning he had approximately $400]."  LLANES stated he would "make sure I grab that paper for my brother [he would get the money from his brother to give to CISNEROS]."

77.    On or about February 7, 2012, at approximately 11:40 a.m. [TP3 Session #422], CISNEROS, who was using Target Phone 3,  had a conversation with LLANES, who was using Llanes Phone 1. During this call, CISNEROS stated, "You called him [cocaine supplier]." LLANES replied, "Yeah, he [cocaine supplier] called me back. He said that he's

---

there." MORALES stated, "All right then."  Surveillance units then followed MORALES to the laundromat called Su Lavenderia located at 7516 W. 63rd Street in Summit, Illinois, (hereinafter, the "Laundromat").  The female driver and MORALES exited the vehicle and entered the Laundromat. As set forth in more detail below, agents arrested CISNEROS at the Laundromat upon his arrival to meet MORALES.  Law enforcement officers questioned MORALES at the scene, and MORALES identified himself as FAUSTINO MORALES.  Agents who met MORALES in person on May 7, 2012 compared his voice to the voice that had been utilizing Morales Phone 1 and Morales Phone 2, and it was the same voice.  Additionally, on May 30, 2012, law enforcement agents stopped MORALES, who again identified himself using that name.  MORALES was initially mis-identified by agents as Christian SANCHEZ, aka "Doughboy."

gonna call me as soon as he uh, gets a hold of this guy." CISNEROS replied, "Do me a favor, ask him [cocaine supplier] if it's the same [quality cocaine] from like, a couple weeks ago, like [U/I] in the beginning." LLANES replied, "Okay. That's [the quality of cocaine] what you want, right?"

78. At approximately 12:13 p.m. [TP3 Session # 425], CISNEROS, who was using Target Phone 3, had a conversation with LLANES, who was using Llanes Phone 1. During the call, LLANES stated, "I talked to him [cocaine supplier]. He said the, um, that he was tryin' to holler at his, at the guy [supplier's source of supply] that he went to last time cause it was for more sure. But I told him, nah that if he can try to get the cars [cocaine] from, from the first uh, auction [another source of cocaine supply]." CISNEROS replied, "If not, whatever." LLANES replied, "All right. But yeah, I just, I told him that if he can try to do that [contact the other source of cocaine supply] first, you know?" CISNEROS replied, "All right. He [cocaine supplier] didn't tell you what time [he would be ready to sell the cocaine] or nothin'?" LLANES replied, "No, he said he's kinda on the, on the makin' the phone calls type of thing [looking for sources of cocaine supply], you know? Usually he'll just be like, 'Yeah, let me call 'em [sources of cocaine supply], and then I'll shoot over there,' you know?" CISNEROS replied, "Oh so it's [a cocaine deal] not even a sure thing?" LLANES replied, "No, it [the cocaine deal] should be for sure." CISNEROS replied, "Alright. Well, let me know if not so I'll start lookin' [for another cocaine supplier]." LLANES replied, "Alright, cool. You know what, I'll give him [the cocaine supplier] a call in 15 minutes and we'll see

what, what he says."

79. At approximately 1:19 p.m. [TP3 Session # 430], CISNEROS, who was using Target Phone 3, had a conversation with an unidentified male (hereinafter, "UM 9732").

a. During this call, UM 9732 stated, "Those guys [cocaine suppliers] didn't, didn't, they didn't want to go over there." CISNEROS replied, "Yeah, yeah, yeah." UM 9732 stated, "The one [cocaine supplier] from, from the other day [an earlier cocaine deal] called me, the one that had the wooden parts. I said, 'I'm going to ask [U/I] if he [possibly CISNEROS] wants some of that [cocaine].'" CISNEROS asked, "Yeah. How is it [the quality of the cocaine]?" UM 9732 replied, "Well, well I think it's, well I don't know if it's the same [quality of cocaine]. He [the cocaine supplier] just ca-, called me. He said we're already there [the cocaine was available for purchase right away]." CISNEROS asked, "Yeah, but I mean the, the, are you, what, I mean, is it better [quality cocaine] or not? Or is it the same [quality cocaine from a prior cocaine deal involving the same supplier]?" UM 9732 replied, "Well I didn't, didn't, didn't ask him, to be honest with you. He only told me, 'Hey, we're already [to sell the cocaine here],' and so." CISNEROS then stated, "The car [cocaine] over here up, up to fifteen [thousand dollars], you know, otherwise it's not fucking worth it to be honest [$15,000 is too high of a price]." UM 9732 stated, "Oh, okay, okay, okay;" and,

40

b.     CISNEROS then stated, "In the meantime, I'm waiting for the mechanic [another source of cocaine supply], which was supposed to come by right now."  CISNEROS later stated, "The thing is that I have to fix the car [get a new supply of cocaine]."  CISNEROS later stated, "I mean, if they're [the cocaine suppliers in contact with UM 9732] going to charge me [for cocaine] as if I get charged the same as if I take it to the shop [a high cocaine purchase price], then that's fucked up." UM 9732 later stated, "Let me, let me ask him [the cocaine supplier] to see if the guy is willing to work something out [sell cocaine at a good price]."  CISNEROS replied, "Okay, you said it, then.  So, you'll call me back?"  UM 9732 replied, "Okay, yes."

80.     At approximately 1:23 p.m. [TP3 Session # 432], CISNEROS, who was using Target Phone 3, had a conversation with LLANES, who was using Llanes Phone 1.  During the call, LLANES stated, "When I called him [cocaine supplier] he said he was still waiting for a call or something like that.  I told him whatever.  I mean if....if this guy from last time [a prior cocaine deal] is around [has cocaine ready to sell immediately] then we'll just go right there.  That way it don't get later."  CISNEROS asked, "Alright, what did he [the cocaine supplier] say?" LLANES replied, "Yeah.  He said he's just waiting for the phone call to come back.  He said, dude [the supplier's cocaine supplier] works.  That, that guy that we seen the other day, works.  Um, I don't know.  Just waiting for his phone call."  CISNEROS then asked, "You don't know for sure [whether this supplier had cocaine available for sale],

41

though?" LLANES replied, "I can call him and see how for sure he is, you know? I don't know if he talked to dude [the supplier's cocaine supplier] and dude's stalling him out or something."

81.     At approximately 1:58 p.m. [TP3 Session # 435], CISNEROS, who was using Target Phone 3, had a conversation with JUAREZ.[18] During this call, JUAREZ stated, "Give fourteen, six [$14,600 for a half kilogram of cocaine]." CISNEROS asked, "And how is it [the quality of the cocaine]?" JUAREZ replied, "How you like it." CISNEROS asked, "Yeah, but, is it good, good, good [very high quality]?" JUAREZ replied, "How you like it. It's fucking good [quality cocaine], that's why I'm calling you." CISNEROS stated, "All right, you said it." JUAREZ asked, "What [amount of cocaine] do you need?" CISNEROS replied, "Well, it would be good, if it's as good [quality cocaine] as you said well then might as well bring the eighteen [ounces of cocaine, or a half kilogram]." JUAREZ replied, "All right, I'll bring it [the cocaine] over there." JUAREZ then agreed to bring 18 ounces of

---

[18]   The identification of JUAREZ and JUAREZ's voice in this Affidavit is based on the following: First, on numerous occasions in 2011 and 2012, the UCA met with JUAREZ at a bar in Summit, Illinois. JUAREZ was known to the UCA as both Ricardo and "Rick." The UCA viewed a digital arrest photograph of JUAREZ and confirmed the individual he knew as Ricardo or Rick was JUAREZ. Second, on March 1, 2012, JUAREZ contacted CISNEROS using telephone number 920-333-0653 ("Juarez Phone 1") to arrange to sell CISNEROS cocaine. At approximately 6:35 p.m. [TP3 Session # 2075], CISNEROS, who was using Target Phone 3, received an incoming call from JUAREZ, who was using Juarez Phone 1. During the call, JUAREZ stated, "Hey, I'm on my way." At approximately 6:42 p.m., surveillance observed a red Chevy pull up and park near Cisneros Residence 1. Surveillance observed two Hispanic men exit the truck and enter the front door of the residence at Cisneros Residence 1. Surveillance agents compared JUAREZ's digital arrest photograph to one of the Hispanic men who entered Cisneros Residence 1 and positively identified him as JUAREZ.

cocaine to CISNEROS in an hour.

82.     At approximately 2:00 p.m. [TP3 Session # 437], CISNEROS, who was using Target Phone 3, had a conversation with UM 9732.  During the call, UM 9732 stated, "Alright.  Hey, I spoke with this dude [cocaine supplier] and he says that, well, that no, that the damn du', dude, he doesn't want to do, do nothing.  He doesn't want to lower it [the price of the cocaine] for nothing."  CISNEROS replied, "Okay."  CISNEROS later stated, "Yes, that's fine.  Um, like [U/I] like I said, It's already been done [CISNEROS already arranged to buy cocaine from another source].  That's fine, we can leave it [a cocaine deal with the source in contact with UM 9732] for next time."  UM 9732 asked, "Oh, did you already get that [cocaine from another source]?"  CISNEROS replied, "Yes.  No, but it's [cocaine] better over there [from the other cocaine source] because of the number [lower purchase price]."

83.     Based on my training and experience, the recorded conversations set forth above, as well my knowledge of the case as a whole, I believe CISNEROS attempted to purchase a quantity of cocaine from UM 9732 using LLANES as a broker.  I further believe that while CISNEROS was communicating with UM 9732, he was also communicating with JUAREZ in an effort to negotiate the best purchase price, quality, and quantity of cocaine.  Ultimately, and as set forth above, CISNEROS agreed to purchase a half kilogram of cocaine from JUAREZ for $14,600.

84.     At approximately 2:07 p.m., agents established surveillance at 7214 W. 60th

43

Place, Summit, Illinois (hereinafter, "Cisneros Residence 2.")[19] At approximately 2:07 p.m. [TP3 Session # 442], CISNEROS, who was using Target Phone 3, received a call from JUAREZ, who was using x-2322 ("Juarez Phone 1"). During the call, CISNEROS stated, "Can you make the nine [ounces of cocaine] instead [of 18 ounces]?" JUAREZ replied, "I'm already on my way over there [to Cisneros Residence 2]. I'm on my way." CISNEROS stated, "For sure? Then, oh, okay then that's fine."

85.     At approximately 2:09 p.m., [TP3 Session #450], CISNEROS, who was using Target Phone 3, spoke with MORALES, who was using Morales Phone 1. During the call, CISNEROS asked MORALES if MORALES had any "money" over there. MORALES replied that he did not have that much, only "about two-hundred, three-hundred [meaning $200 or $300 dollars]." CISNEROS told MORALES, "Phats is going to pass by to pick them up, dude [CABRERA was going to come by to pick up the money from MORALES]."

86.     At approximately 2:10 p.m. [TP3 Session 451], CISNEROS asked CABRERA, "Where are you?" CABRERA replied, "Right here at Fern's house [at FERNANDO LLANES' residence]." CISNEROS then told CABRERA, "Okay, go by fucking fat boy's [MORALES' residence] too, no?"

87.     Beginning at approximately 2:01 p.m., CISNEROS, who was using Target Phone 2, exchanged a series of text messages with ROSALES, who was using (708) 646-

_____

[19] I believe that CISNEROS is associated with Cisneros Residence 2 based on surveillance as well as intercepted conversations during which CISNEROS and others referenced this location, and then surveillance observed those individuals arrive at Cisneros Residence 2.

8756 (hereinafter, "Rosales Phone 1").[20] During this exchange, at approximately 2:12 p.m. [TP2 Session # 606], CISNEROS asked, "what time." At approximately 2:13 p.m. [TP2 Session # 607], ROSALES responded, "I'm at parents now u tell me." At approximately 2:20 p.m. [TP2 Session # 608], CISNEROS stated, "Sooner the better." At approximately 2:21 p.m. [TP2 Session # 609], ROSALES stated, "K give me a few." At approximately 2:23 p.m. [TP2 Session # 611], ROSALES stated, "If not by 230 [2:30 p.m.] .i could come back 2morrow anytme before 2pm and help u [with either money or narcotics for a narcotics transaction] then no big deal." At approximately 2:25 p.m., CISNEROS and ROSALES resumed their exchange of text messages between Target Phone 2 and Rosales Phone 1. At approximately 2:25 p.m. [TP2 Session # 612], CISNEROS stated, "K cause I'm waiting." At approximately 2:26 p.m. [TP2 Session # 613], ROSALES responded, "Oh ok u need me 1st?" [to give CISNEROS the money to purchase the cocaine] At approximately 2:26 p.m. [TP2 Session 614], CISNEROS stated "That will work." At approximately 2:29 p.m. [TP 2 Session # 615], ROSALES asked, "K pr [meaning, ok is Individual B with CISNEROS] now?"

88. At approximately 2:23 p.m., surveillance observed a 2000 black Lincoln four

---

[20] The identification of ROSALES in this Affidavit is based on the following: First, surveillance agents identified ROSALES based on their prior review of a photograph of ROSALES taken by the Midlothian Police Department in connection with a prior arrest. Second, law enforcement positively identified ROSALES during his arrest on March 20, 2012. Agents who spoke to Rosales in person post-arrest compared his voice to the individual whose voice was intercepted placing calls to Target Phones 2 and 3, and determined the voice on the phone was that of ROSALES.

door, Illinois registration #L773547, park three houses down from Cisneros Residence 2. This vehicle was registered to RICARDO JUAREZ (hereinafter, "Juarez Vehicle 1"). Surveillance then observed a Hispanic male later identified as Individual B, and another Hispanic male, exit that vehicle, walk toward Cisneros Residence 2, and enter the side door of Cisneros Residence 2. Surveillance further observed that Individual B was carrying a white plastic bag that contained what appeared to be a weighted square-shaped object that was consistent with either a package of narcotics or a stack or stacks of money.

89.    Based on my training and experience, the recorded conversations set forth above, as well my knowledge of the case as a whole, I believe that JUAREZ or his associates either delivered the half-kilogram of cocaine to CISNEROS DTO members at Cisneros Residence 2, or picked up money from CISNEROS DTO members for the cocaine CISNEROS had agreed to purchase.

90.    At approximately 2:28 p.m., surveillance observed RAMIREZ exit the side door of Cisneros Residence 2 and walk to the street. At approximately 2:30 p.m., surveillance observed CABRERA arrive in a white 2006 Chevrolet Impala, Illinois license plate L761 637 (hereinafter, "Cisneros Vehicle 1"), and park in front of Cisneros Residence 2. CABRERA entered Cisneros Residence 2, and exited almost immediately. CABRERA re-entered his vehicle and drove away.

91.    At approximately 2:33 p.m. [TP2 Session # 617], CISNEROS, who was using Target Phone 2, had a conversation with ROSALES, who was using Rosales Phone 1.

During the call, CISNEROS asked, "Everything's fine?" ROSALES replied, "That white car [CABRERA] is coming this way." CISNEROS asked, "Huh?" ROSALES replied, "I said, you got uh .tank ..i think Tank [CABRERA] or your brother [RAMIREZ] coming this way." CISNEROS replied, "Oh, oh. Okay, okay. Where you at now?" ROSALES replied, "I'm parked out here [outside Cisneros Residence 2]. Let me just run in real quick." CISNEROS replied, "Okay." ROSALES asked, "Coming out or you wanna come out?" CISNEROS stated, "Yeah, I'll come out." ROSALES replied, "Alright, I'm here."

92.     At approximately 2:40 p.m., surveillance observed a 2005 black Chevy sport utility vehicle (hereinafter, "Rosales Vehicle 1" and "Rosales Residence 1"), arrive at Cisneros Residence 2.[21]     Surveillance identified the driver of Rosales Vehicle 1 as ROSALES. At that time, surveillance observed RAMIREZ, who was still standing by the street, enter the passenger side door of Rosales Vehicle 1, and then saw the ROSALES drive away slowly from Cisneros Residence 2.

93.     At approximately 2:39 p.m. [TP2 Session # 619], CISNEROS, who was using Target Phone 2, had a conversation with ROSALES, who was using Rosales Phone 1. During the call, CISNEROS stated, "Send that shit [money or cocaine] man. Where's my brother [RAMIREZ]?" ROSALES replied, "I'm cruising around with him [RAMIREZ].

---

[21] This vehicle had the same subscriber name and address associated with Rosales Phone 1. As discussed in paragraphs 121-140 below, on or about February 16, 2012, agents intercepted texts in which ROSALES directed CISNEROS to an intersection near Rosales Residence 1, and those texts were sent at the same time that surveillance observed CISNEROS driving to Rosales Residence 1.

We're trying to peep [counter-surveillance measure] this uh, this truck that's uh, in the parking lot." CISNEROS stated, "Yeah, that's what I was looking at too. I was like what the fuck." ROSALES stated, "They're, it looks like there's two people in there [the truck]. They're still there?" CISNEROS stated, "Yeah." ROSALES stated, "Yeah it looks like there's two people there. We're, we're gonna come from behind them. And see from the street. But he had his brake light on when we drove by the first time and then he took it off. He had like his foot on the brake pedal."

94.     ROSALES later stated,"But we haven't seen nobody come in or out [of the truck]." CISNEROS asked, "But it's like right in the middle [of the parking lot], right?" ROSALES replied, "Yeah, it's just standing right there in the middle. But the windows aren't tinted or anything." An unknown male in the background then stated, "It's just a regular [not law enforcement]?" ROSALES stated, "Yeah they're just regular. We're about to turn right now right now actually." CISNEROS asked, "You're looking at them now?" ROSALES replied, "Yeah. Hum, I don't know. We're about to turn right here." CISNEROS and ROSALES then shared observations of the two occupants of the truck and what the truck was doing as ROSALES drove around with RAMIREZ.

95.     ROSALES stated, "I don't know. I'm not driving pass him [the truck] no more." ROSALES later observed, "He's [the truck] braking." CISNEROS asked, "Aw, he's braking now?" ROSALES replied, "Yeah." CISNEROS stated, "He's braking." ROSALES stated, "He's probably, he's probably just waiting for somebody. Is he leaving?" CISNEROS

replied, "Yeah." ROSALES stated, "Well let's see." ROSALES later stated, "He just went straight. You know what, I'm gonna' make a right, right now and cut him off." CISNEROS asked, "See where you see him, no?" ROSALES replied, "Yeah I'm gonna see who, I just seen him go by. Nobody got in there [the truck] though, right? Your brother [RAMIREZ] said." CISNEROS replied, "Nah, nah." ROSALES then stated, "No? Alright well, well let your brother talk to you when you get back." ROSALES then stated, "I'm gonna try to cut him [the truck] off."

96.     Based on my training and experience, the recorded conversations set forth above, as well my knowledge of the case as a whole, I believe that ROSALES and RAMIREZ were conducting counter-surveillance measures after they observed a law enforcement surveillance vehicle parked in a parking lot near Cisneros Residence 2. As a result of CISNEROS', ROSALES', and RAMIREZ's counter-surveillance measures, surveillance was terminated.

97.     Beginning at approximately 2:47 p.m., CISNEROS, who was using Target Phone 2, exchanged another series of text messages with ROSALES, who was using Rosales Phone 1. At approximately 2:47 p.m. [TP2 Session # 622], CISNEROS stated, "Yooooo." At approximately 2:52 p.m. [TP2 Session # 624], ROSALES responded, "Just left." At approximately 2:56 p.m. [TP2 Session # 626], CISNEROS stated, "whenever." At approximately 2:57 p.m. [TP2 Session # 627], ROSALES stated, "K if I can come back2day I will otherwise call me when u wake up."

98.     At approximately 2:51 p.m. [TP2 Session #623], CISNEROS, who was using Target Phone 2, spoke with CABRERA, who was using (630) 452-0928 ("Cabrera Phone 1"). During the call, CISNEROS asked CABRERA where he was located, and CABRERA told CISNEROS that he was with another unidentified individual. CABRERA then handed the phone to the unidentified individual, who said that they were "picking up a little paper [money]." The unidentified individual then handed the phone back to CABRERA, and CISNEROS told CABRERA to drop the individual off and either go home or go by "D's for little [DIANA CISNEROS or Cisneros Residence 1]."

99.     Based on my training and experience, the calls and surveillance set forth above, as well as my and knowledge of the case as a whole, I believe that after CISNEROS arranged to purchase a half-kilogram quantity of cocaine from JUAREZ, workers in his DTO, namely, LLANES, RAMIREZ, MORALES, ROSALES, CABRERA, and Individual B assisted CISNEROS by either dropping off money to CISNEROS at Cisneros Residence 2, or by collecting money to pay for the cocaine CISNEROS had agreed to purchase. RAMIREZ and ROSALES also assisted CISNEROS by conducting counter-surveillance during the deal. I further believe that JUAREZ met with Cisneros later that day to deliver the cocaine after surveillance was terminated due to the counter-surveillance measures implemented by members of the DTO.

100.     At approximately 4:24 p.m, [TP3 Session #464], CISNEROS, using Target Phone 3, spoke with JUAREZ, who was using Juarez Phone 1. During the call, JUAREZ

50

told CISNEROS that he was at a restaurant. CISNEROS told JUAREZ, "My buddy is there, he's going to be there." JUAREZ replied, "Listen, it was a thousand six, what was left [$1600] (payment for partially fronted cocaine)." CISNEROS agreed.

101. At approximately 4:31 p.m. [TP3 Session #466], CISNEROS, using Target Phone 3, spoke with LLANES, who was using 316010151045555 ("Llanes Phone 1"). During the call, LLANES told CISNEROS that "...this guy's not here. You wanna give him a call?" CISNEROS, using Target Phone 3, immediately called JUAREZ, who was using Juarez Phone 1 [TP3 Session #467], and asked, "Where are you?" JUAREZ replied, "I'm here, I'm in front." CISNEROS then called LLANES [TP3 Session #468] and LLANES stated "Okay, I see him."

102. Based on my training and experience, the recorded conversations set forth above, as well my knowledge of the case as a whole, I believe that CISNEROS owed JUAREZ $1,600 from the half-kilogram quantity of cocaine that he had purchased from JUAREZ earlier that day. CISNEROS arranged for LLANES to meet JUAREZ at the restaurant so that LLANES could pay JUAREZ the remainder of the money he owed from the deal on CISNEROS' behalf.

**M.      CISNEROS Sells the UCA a One-Half Kilogram Quantity of Cocaine (February 9, 2012).**

103. On or about February 8, 2012, beginning at approximately 9:50 p.m., CISNEROS, who was using Target Phone 2, exchanged a series of text messages with the UCA. At approximately 9:50 p.m. [TP2 Session # 695], the UCA stated, "U gonna be around

51

tomorrow bro I need to come through [purchase cocaine]." CISNEROS replied [TP2 Session 696], "Yea." The UCA asked [TP2 Session # 699], "Koo can we do 18 [ounces of cocaine] bro?????" CISNEROS responded [TP2 Session # 707], "Yea bro." The UCA stated [TP2 Session # 710], "Kooo ill hit ya up tomorrow bro."

104. On or about February 9, 2012, beginning at approximately 12:16 p.m., CISNEROS, who was using Target Phone 3, exchanged another series of text messages with the UCA. The UCA stated, "what's the number on that [18 ounces of cocaine]." CISNEROS replied, "117 [$11,700]."

105. At approximately 12:29 p.m. [TP3 Session #594], CISNEROS, who was using Target Phone 3, had a conversation with MORALES, who was using Morales Phone 1. During the call, CISNEROS asked MORALES if his wife was home. MORALES stated she was not. CISNEROS asked, "She can't give you a ride over here, dude?"

106. At approximately 12:46 p.m. [TP3 Session #599], CISNEROS, who was using Target Phone 3, again spoke with MORALES, who was using Morales Phone 1. MORALES told CISNEROS that his wife was not home, however he could start walking over there. CISNEROS stated "Well, remember what I lent you, to hold for me [meaning a quantity of cocaine]?" MORALES stated "Yeah." CISNEROS stated, "So if you want to do me that favor, but it's better with her, right?" MORALES replied, "Yeah. Well, if you want to wait for her to arrive or I'll shoot over there walking."

107. Based on my training and experience, the recorded conversations set forth

above, as well my knowledge of the case as a whole, I believe that CISNEROS asked MORALES to bring a quantity of cocaine over to CISNEROS' residence to sell to the UCA. CISNEROS wanted MORALES to either drive in the car with MORALES' wife or to walk over with the cocaine. Based on my training and experience, it is common for narcotics traffickers in this type of area to use female associates to transport narcotics to avoid being detected by law enforcement. Additionally, based on my training and experience, particularly my experience investigation narcotics trafficking in Summit, Illinois, it is common for narcotics traffickers in this type of area to carry narcotics on foot to lesson the risk that they will be stopped by law enforcement in their vehicles.

108. At approximately 12:54 p.m. [TP3 Session # 603], CISNEROS, who was using Target Phone 3, had a conversation with Individual A, who was using telephone number (708) 257 6487 ("Individual A Phone 1"). During the call, CISNEROS stated, "Can you come by the house?" Individual A asked, "Right now?" CISNEROS replied, "Yeah, by my house." Individual A replied, "Alright, I'll be over there." CISNEROS replied, "All right, hurry up, all right. Aw, hey bring jun's bike." Individual A replied, "Jun's bike?" CISNEROS replied, "Come in Jun's bike, yeah." At approximately 1:07 p.m., surveillance observed RAMIREZ arrive at Cisneros Residence 2 on a bicycle and enter the residence. At approximately 1:13 p.m., surveillance observed CISNEROS arrive at and enter Cisneros Residence 2.

109. At approximately 1:25 p.m., [TP3 Session #607] CISNEROS, who was using

Target Phone 3, spoke with MORALES, who was using Morales Phone 1. MORALES told CISNEROS that, he was "by seventy-fourth (74th) by the street of the... by my street, dude, but I'm going towards Harlem already [explaining the route MORALES would walk from his residence to Cisneros Residence 2]." At approximately 1:35 p.m., surveillance agents observed MORALES walk through the alley and into Cisneros Residence 2.

110.    Based on my training and experience, the recorded conversations set forth above, as well my knowledge of the case as a whole, I believe that CISNEROS arranged for RAMIREZ and MORALES to bring a quantity of cocaine to Cisneros Residence 2 in order to sell that cocaine to the UCA. Additionally, based on the above calls and paragraph 108, I believe that CISNEROS instructed RAMIREZ, through Individual A, to bring the cocaine from Cisneros Residence 1 to Cisneros Residence 2 on a bicycle, so as to avoid being stopped by the police. Further, I believe that CISNEROS arranged for MORALES to bring the cocaine from MORALES' residence to Cisneros Residence 2 on foot also to avoid being stopped by the police.

111.    At approximately 2:54 p.m., CISNEROS, who was using Target Phone 3, received a text message from the UCA, stating, "5 [minutes] away where u want me bro." At approximately the same time [TP3 Session # 612], CISNEROS, who was using Target Phone 3, had a conversation with RAMIREZ, who was using Ramirez Phone 1. During the call, CISNEROS asked, "Where are you?" RAMIREZ replied, "I'm on my way right now to your house." CISNEROS then responded to the UCA by text from Target Phone 3,

stating, "Auto zone [Advance Auto]". At approximately 3:09 p.m., the UCA met with RAMIREZ in the parking lot of Advance Auto.

112. Before this meeting, the UCA was outfitted with a concealed audio and video recording device and given $11,700 in undercover funds. After the UCA arrived in the Advance Autoparking lot, surveillance observed RAMIREZ exit Cisneros Residence 2, walk to the Advance Auto parking lot, and enter the UCA's vehicle.

113. During this recorded meeting, RAMIREZ handed the UCA a plastic grocery bag containing suspect cocaine in exchange for $11,700. RAMIREZ stated, "That's a fucking half [kilogram of cocaine] bro. Where you going to stack [hide] this mother fucker?" The UCA told RAMIREZ he had a "spot [a secret compartment in the vehicle to hide the cocaine]." RAMIREZ and the UCA then did the Latin King handshake, and RAMIREZ exited the UCA vehicle.

114. At approximately 3:10 pm, surveillance observed RAMIREZ exit the UCA vehicle and walk back to Cisneros Residence 2. The UCA returned to a briefing location, where he gave agents a plastic grocery bag that contained two ziplock bags, each containing a white chunky substance. Agents subsequently submitted the substance to the DEA lab for analysis, which determined that the substance weighed approximately 500.8 grams and contained Cocaine Hydrochloride.

**N.    CISNEROS Sells a Customer a Quantity of Cocaine (February 9, 2012).**

115. On or about February 9, 2012, at approximately 1:56 p.m. [TP2 Session #721]

CISNEROS, who was using Target Phone 2, spoke to Individual C, who was using (773) 263-7329 ("Individual C Phone 1"). Individual C is a CISNEROS DTO drug customer. Individual C asked CISNEROS "What's up with the um, I need some paint, bro'. You got some extra paint, I can buy off you [meaning a quantity of cocaine]?" CISNEROS stated he would have to check. CISNEROS then stated, "What about...what about you do this for me. You come to my mom's house [Cisneros Residence 2] and you get all the paint and you take it home. But, you can get all the paint [meaning you can take all the cocaine CISNEROS had left]." Individual C stated, "Okay. I gotta get my workers." CISNEROS and Individual C then agreed to meet at Cisneros Residence 2 to conduct the transaction.

116.   At approximately 2:53 p.m. [TP2 Session #728], CISNEROS spoke with Individual C. Individual C told CISNEROS, "Okay. I'm gonna take uh...I'm gonna take half today, half tomorrow." CISNEROS stated "Okay." Individual C then stated, "You got my word. It'll be...all be out of there."

117.   Based on my training and experience, the recorded conversations set forth above, as well my knowledge of the case as a whole, I believe that Individual C arranged to purchase a quantity of cocaine from CISNEROS on a fronted basis.

**O.     CISNEROS and DIANA CISNEROS Supply Cocaine to a Drug Customer (February 15, 2012).**

118.   On or about February 15, 2012, at approximately 6:02 p.m. [TP3 Session # 1160] CISNEROS, using Target Phone 3, had a conversation with BILLY LNU.[22] During

---

[22]  During the call, the caller identified himself as "Billy."

56

the call, CISNEROS stated, "What's up bro?" BILLY LNU replied, "Nothing uh ay uh, same [narcotics deal] as last one." CISNEROS stated, "Like earlier [narcotics deal]." Billy LNU stated, "Yeah, yeah exactly." CISNEROS asked, "Where you at?" BILLY LNU replied, "Uh, I'm by my crib." CISNEROS asked, "How long?" BILLY LNU replied, "Uh, give me like uh, five minutes." CISNEROS replied, "Okay."

119.    At approximately 6:03 p.m. [TP3 Session # 1162], CISNEROS, who was using Target Phone 3, had a conversation with DIANA CISNEROS, who was using telephone number (708) 257 6452 ("Diana Cisneros Phone 1").[23] During the call, CISNEROS stated, "Do me a favor. Billy [BILLY LNU] is going [to come by Cisneros Residence 1] right now." DIANA CISNEROS replied, "Uh huh." CISNEROS asked, "Can you give him my shoes [narcotics]? They are right there on top of the, you know where the coffee is." DIANA CISNEROS replied, "Hold on..yeah." CISNEROS replied, "You see it?" DIANA CISNEROS replied, "Yeah."

120.    Based on my training and experience, the recorded conversations set forth above, as well my knowledge of the case as a whole, I believe that Cisneros directed DIANA

---

[23] The identification of DIANA CISNEROS and DIANA CISNEROS' voice is based on the following: First, telephone number 773-941-9253 was a phone used by a female and subscribed to DIANA CISNEROS. On May 7, 2012, DIANA CISNEROS was interviewed by agents. Agents compared the voice from the person they interviewed with the voice on the intercepted calls from number 773-941-9253 and Diana Cisneros Phone 1, and determined that it was the same voice. Second, on multiple occasions DIANA CISNEROS was observed alone and with CISNEROS. Agents viewed a digital photograph attached to an Illinois driver's license of DIANA CISNEROS and confirmed that the female individual with CISNEROS was DIANA CISNEROS. DIANA CISNEROS was also present during CISNEROS' arrest on May 7, 2012, and was interviewed by law enforcement officers.

CISNEROS to retrieve the cocaine and deliver it to a CISNEROS drug customer, namely, BILLY LNU.

### P. CISNEROS Arranges to Purchase a One-Half Kilogram Quantity of Cocaine from JUAREZ, and Instructs RAMIREZ, MORALES, CABRERA, LLANES, and ROSALES to Deliver Drug Proceeds so that CISNEROS Can Use the Proceeds to Purchase the Cocaine (February 16, 2012).

121. As set forth below, on or about February 16, 2012, CISNEROS arranged to purchase a half-kilogram quantity of cocaine from JUAREZ. After CISNEROS arranged to purchase cocaine from JUAREZ, CISNEROS arranged to pick up drug proceeds from RAMIREZ, MORALES, CABRERA, LLANES, and ROSALES so that CISNEROS could use the proceeds to purchase the cocaine from JUAREZ. CABRERA also assisted CISNEROS by delivering cocaine to one of the CISNEROS DTO drug customers.

122. On or about February 15, 2012 [TP2 Session #1294], CISNEROS, who was using Target Phone 2, spoke with CABRERA, who was using Cabrera Phone 1. During the call, CABRERA stated, "Hey, this isn't... he wanted the other one, ain't it [this wasn't the kind of cocaine the unidentified drug customer requested]?" CABRERA went on to say, "mix that other one. The other one. He didn't want this one. Remember, the one I... just walked with?" CISNEROS affirmed, and CABRERA stated, "He wants one of those." CISNEROS asked, "Who?" CABRERA replied, "Same guy where you just sent me." CISNEROS then asked if the unidentified drug customer wanted "another one," to which CABRERA stated, "No, just he... he gave me back this one." CABRERA and CISNEROS then agreed to meet in

58

person.

123.    Based on my training and experience, the recorded conversations set forth above, as well my knowledge of the case as a whole, I believe that CISNEROS sent CABRERA to deliver a quantity of cocaine to a drug customer, and the drug customer requested that CISNEROS supply him with cocaine of a different quality.  CABRERA then agreed to meet with CISNEROS so that CISNEROS could give CABRERA a different supply of cocaine to give to the drug customer.

124.    On or about February 16, 2012, beginning at approximately 12:05 p.m., CISNEROS, who was using Target Phone 2, exchanged a series of text messages with Individual A, who was using Individual A Phone 1.  At approximately 12:05 p.m. [TP2 Session # 1318], CISNEROS stated, "Chris [Christian RAMIREZ] home?" Individual A replied, [TP2 Session # 1319], "yea he's sleeping." CISNEROS stated [TP2 Session # 1320], "Wake him up tell him we gotta take a ride."

125.    At approximately 12:31 p.m. [TP2 Session # 1326], CISNEROS, who was using  Target Phone 2, had a conversation with LLANES, who was using (773) 850-5059 (hereinafter, "Llanes Phone 2.")  During the call, LLANES stated, "I was on the phone with this guy [cocaine supplier] uh, he said he's uh, gonna come out here [Summit] before traffic comes out here but he's uh, talking to, my guy is gonna come out this way.  From out east." CISNEROS replied, "Oh he's already coming?"  LLANES replied, "No he said he's waiting for his guy [the supplier's cocaine supplier] to come through [provide cocaine].  But uh he

59

said he's in the middle of all that so. Still waiting on him." CISNEROS replied, "So he's coming before traffic or after traffic?" LLANES replied, "No before." LLANES also stated, "like I said, I have a little more than one [a little more then $1000 to pay for fronted cocaine]." LLANES and CISNEROS [TP2 Session #1328] later agreed to meet. LLANES stated, "I'm right here by Veneno's, across the street," and CISNEROS replied, "Oh, okay, okay. Uh...I'll be, I'll be in front, like in, shit...three minutes."

126.   At approximately 12:35 p.m. [TP3 Session # 1204], CISNEROS, who was using Target Phone 3, had a conversation with JUAREZ, who was using Juarez Phone 1. During the call, JUAREZ stated, "We're good now [cocaine is available for purchase]." CISNEROS replied, "Okay and, how is it [cocaine quality]?" JUAREZ replied, "What do you think?" CISNEROS replied, "Good?" JUAREZ replied, "Of course."

127.   At approximately 12:55 p.m. [TP3 Session # 1208], CISNEROS, who was using Target Phone 3, had a conversation with ROSALES, who was using Rosales Phone 1. During the call, CISNEROS stated, "I'm on my way already, bro." At approximately 1:04 p.m., surveillance observed RAMIREZ drive away from Cisneros Residence 1 in a tan Chevy Avalanche, Illinois registration #43278P, registered to CISNEROS' mother (hereinafter, "Cisneros Vehicle 2"), with CISNEROS, who was riding in the passenger's seat.

128.   Beginning at approximately 1:08 p.m., CISNEROS, who was using Target Phone 2, exchanged a series of text messages with ROSALES, who was using Rosales Phone 1. At approximately 1:08 p.m. [TP2 Session # 1327], CISNEROS stated, "on my way for

60

real lol?" At approximately 1:10 p.m. [TP2 Session # 1331], ROSALES stated, "Lol ok ill be here." At approximately 1:29 p.m. [TP2 Session # 1332], CISNEROS stated, "167 [Street]?" At approximately 1:29 p.m. [TP2 Session # 1333], ROSALES stated, "Yes and 90th [Street]." At approximately 1:33 p.m. [TP2 Session # 1334], CISNEROS stated, "here." At approximately 1:33 p.m. [TP2 Session # 1335], ROSALES stated, "Ok come in park in the driveway."

129.    At approximately 1:34 p.m., surveillance observed CISNEROS and RAMIREZ drive Cisneros Vehicle 2 into the driveway of Rosales Residence 1. At approximately 1:37 p.m., surveillance observed RAMIREZ and CISNEROS leave Rosales Residence 1 in Cisneros Vehicle 2, and ultimately return to a garage at Cisneros Residence 1.

130.    At approximately 3:09 p.m. [TP2 Session # 1340], CISNEROS, who was using Target Phone 2, had a conversation with LLANES, who was using Llanes Phone 2. During the call, LLANES stated, "Right here at my sister's crib, waiting on his phone call." CISNEROS later stated, "Well just, just whenever you, as soon as possible stop this way, no? So can see me with that stuff [money] so you can take care of it." LLANES agreed. A short time later, surveillance observed a light colored SUV, bearing Illinois registration #7642343, which is registered to a B. Llanes, arrive in the alley behind Cisneros Residence 1.

131.    Based on my training and experience, the recorded conversations set forth above, as well my knowledge of the case as a whole, I believe that CISNEROS met with LLANES and ROSALES to collect money from previous cocaine sales so that CISNEROS

could use the drug proceeds to purchase cocaine from JUAREZ later that day.

132.    At approximately 3:16 p.m. [TP3 Session # 1217], CISNEROS, who was using Target Phone 3, had a conversation with JUAREZ, who was using Juarez Phone 1. During the call, JUAREZ stated, "Hey, I'm on my way." At approximately 3:34 p.m., surveillance observed a grey Chevy truck arrive at Cisneros Residence 2. Surveillance further observed two Hispanic males, one of whom was later identified as JUAREZ, exit the truck and enter the residence.

133.    At approximately 3:37 p.m. [TP3 Session # 1219], CISNEROS, who was using Target Phone 3, had a conversation with JUAREZ, who was using Juarez Phone 1. During the call, JUAREZ stated, "Well, we arrived [at Cisneros Residence 2] with your brother [RAMIREZ]. Should we go over there [Cisneros Residence 1]?" CISNEROS asked, "Where are you now?" JUAREZ replied, "Here [at Cisneros Residence 2] with your brother [RAMIREZ]." CISNEROS replied, "Okay, okay. Oh, I didn't know. I thought you were still coming over here [Cisneros Residence 1]. Alright then." JUAREZ stated, "I'm on my way [to Cisneros Residence 1]." At approximately 3:39 p.m., surveillance observed RAMIREZ, JUAREZ, and the other Hispanic male who was previously seen entering Cisneros Residence 2 depart the residence, drive the Chevy pick up to Cisneros Residence 1, and enter Cisneros Residence 1.

134.    At approximately 3:49 p.m. [TP3 Session #1227], CISNEROS, using Target Phone 3, spoke with MORALES, who was using Morales Phone 1. CISNEROS asked

MORALES, "You got anything over there [meaning money]?" MORALES stated, "I got a few bucks, but if you gonna leave…somebody is coming over right now [a customer was coming to MORALES' to purchase some cocaine]." CISNEROS stated, "Nah, I actually need it, need it right now, Bro." At 3:50 p.m. [TP3 Session #1228], MORALES, who was using Morales Phone 1, stated, "I don't know, I gonna count right now." CISNEROS replied, "Let me know right now."

135.    At approximately 3:55 p.m., surveillance observed RAMIREZ, JUAREZ, and the other Hispanic male referenced in paragraph 132 exit Cisneros Residence 1, and reenter the Chevy truck in which they arrived. The Chevy truck drove back to Cisneros Residence 2 and RAMIREZ exited the vehicle. RAMIREZ entered Cisneros Residence 2.

136.    Based on my training and experience, the recorded conversations set forth above, as well my knowledge of the case as a whole, I believe that JUAREZ delivered cocaine that CISNEROS purchased and that RAMIREZ paid JUAREZ for the cocaine.

137.    At approximately 4:15 p.m. [TP3 Session #1236], CISNEROS, who was using Target Phone 3, had a conversation with MORALES, who was using Morales Phone 1. CISNEROS told MORALES, "Hey my girl is gonna go over there [DIANA CISNEROS would come to MORALES' residence with a quantity of cocaine or drug proceeds]."

138.    At approximately 4:16 p.m. [TP3 Session # 1241], CISNEROS, who was using Target Phone 3, had a conversation with JUAREZ, who was using Juarez Phone 1. During the call, CISNEROS stated, "I don't know if you checked this [package containing cocaine]

or, or your, I don't know who. But, every time they..it's kind of low [short of the agreed upon amount of cocaine]. Look out [check the amount of cocaine in the package] for the next time okay? Only have them pay attention. Well because, pure waste [of money] you see." JUAREZ replied, "Well I just checked. How much [cocaine] was missing? Well, I checked [weighed the cocaine] that they were five, five hundred and five hundred and three [503 grams of cocaine], three I think." CISNEROS replied, "I don't know, because here it was [weighed] at about 496 to 92 to 93 [between 492 and 496 grams of cocaine], more or less." JUAREZ replied, "For the next one [cocaine shipment] I'll put it only that right now since it was quick that's why. For the next time I'll look [inspect the quantity of the cocaine] closely. I will, generate something more." CISNEROS replied, "Yes, no because imagine. The other one [a prior cocaine shipment was short] too. But I didn't tell you. But I said oh well with that, its not a problem. But that's it. Imagine every single time [the cocaine shipment is short]? Well one is losing out." JUAREZ replied, "No don't worry. It's that I didn't pay attention to that. The other [shipment], well the other, I don't know. Well [U/I] have always sent it right [correct quantity of cocaine shipments]. For the next one, I'll tell you what, I'll check it right there. So that they don't, they won't, so that you won't be dissatisfied." CISNEROS agreed.

139. On or about February 19, 2012, at approximately 7:37 p.m. [TP2 Session #1516] CISNEROS, who was using Target Phone 2, spoke with CABRERA, who was using Cabrera Phone 1. CABRERA stated, "Oh, I just called your brother [RAMIREZ]."

CABRERA then asked, "Yeah. He said ... you want me to go over there or you want me to go through you [do you want me to pick up a quantity of cocaine to sell from CISNEROS or RAMIREZ]?" CISNEROS replied, "It's up to you."

140.    Based on my training and experience, the recorded conversations set forth above, as well my knowledge of the case as a whole, I believe that on February 16, 2012, CISNEROS arranged to purchase a half kilogram quantity of cocaine from JUAREZ. I believe that after CISNEROS arranged to purchase a quantity of cocaine from JUAREZ, CISNEROS arranged for workers in his DTO, namely, RAMIREZ, MORALES, CABRERA, LLANES, and ROSALES, to pick up drug proceeds so that CISNEROS could use the money to purchase cocaine from JUAREZ. I further believe that CISNEROS told MORALES that DIANA CISNEROS would come to MORALES' residence with a quantity of cocaine or drug proceeds. Once CISNEROS purchased the cocaine from JUAREZ, CISNEROS broke down the cocaine into smaller quantities, and redistributed it to members of his organization to sell. Further, I believe that after receiving the cocaine from JUAREZ, CISNEROS called JUAREZ to complain that the weight of the cocaine was less than agreed upon, namely, the amount of cocaine JUAREZ provided was between 492 and 496 grams instead of 500 grams (half kilogram).

**Q.     CISNEROS Arranges to Purchase a One-Half Kilogram Quantity of Cocaine from JUAREZ on a Partially Fronted Basis, Uses Drug Proceeds Provided by LLANES to pay for the Cocaine, and Instructs RAMIREZ to Obtain the Cocaine from JUAREZ (March 1, 2012).**

141.    As set forth below, between February 22 and March 1, 2012, CISNEROS

65

arranged to purchase a quantity of cocaine from JUAREZ for $14,600 on a fronted basis. CISNEROS also arranged for LLANES to drop off drug proceeds prior to the deal so that CISNEROS could use the proceeds to purchase the cocaine on a partially fronted basis. After CISNEROS arranged to purchase the cocaine, RAMIREZ met with JUAREZ at Cisneros Residence 1 to obtain the cocaine and pay JUAREZ. During the deal, CISNEROS further instructed RAMIREZ to tell JUAREZ that he (CISNEROS) would pay him the additional $600 at a later time. CISNEROS also asked RAMIREZ to check the quantity and quality of the cocaine before JUAREZ left Cisneros Residence 1, and later called RAMIREZ to confirm that the drug deal had taken place according to plan.

142.    On February 22, 2012, at approximately 10:24 a.m. [TP3 Session #1539], CISNEROS, who was using Target Phone 3, spoke with JUAREZ, who was using Juarez Phone 1. CISNEROS asked JUAREZ, "How are you, good or not [did JUAREZ have cocaine to sell CISNEROS]?" JUAREZ later asked, "Were you going to need the same?" CISNEROS replied, "No, half of that [a quarter of a kilogram]."

143.    On February 28, 2012, at approximately 12:12 p.m. [TP3 Session #1926], CISNEROS, who was using Target Phone 3, spoke with JUAREZ, who was using Juarez Phone 1. JUAREZ stated, "Yeah, it's that he got kind of happy yesterday and...Right now... but you are going to love that [cocaine]." CISNEROS asked, "Oh okay is it all solid?" JUAREZ stated, "Affirmative.... it's bad ass... you are going to like it you'll see."

144.    On February 29, 2012, at approximately 4:01 p.m. [TP3 Session #1996],

CISNEROS, who was using Target Phone 3, spoke with JUAREZ, who was using Juarez Phone 1. JUAREZ stated, "I just called right now various places with two, three told me for today. But anyways they aren't losses. Well...if that...if I get that right now it's going to be...I'm only going to get hum...five...five boxes. To...to...to see if you help me [price for a kilogram of cocaine was $23,000, and JUAREZ was going to obtain five kilograms]."

145. On March 1, 2012, at approximately 12:41 p.m. [TP2 Session #2182], CISNEROS, who was using Target Phone 2, spoke with LLANES, who was using LLanes Phone 2. CISNEROS told LLANES, "Stop by to get something [pick up a quantity of cocaine]." LLANES later stated, "Um … that is already there (U/I) right there, you know [did CISNEROS already purchase cocaine from another supplier]?" LLANES went on to tell CISNEROS, "Um...I'm straight right here for you, too [LLANES had money to drop off to CISNEROS]."

146. On March 1, 2012, at approximately 2:32 p.m.,[TP3 Session # 2045] CISNEROS, who was using Target Phone 3, received an incoming call from JUAREZ, who was using Juarez Phone 1. During the call, CISNEROS stated, "What's the word? I put minutes on this one yesterday [Target Phone 3's minutes had expired at midnight on February 29, 2012 and CISNEROS had recently paid his bill for March]." JUAREZ replied, "You said so. Right now just let me...I'm ready, the guy is coming here already...right now I'll shoot that way, just calling to let you know that I'm going over there already." CISNEROS asked, "Okay, do you know around what time?" JUAREZ replied, "Well he had told me earlier that

67

in an hour and a half, in the time that he makes from where he is coming from to here....and I'll leave from here, but half hour has passed, but let me see, right now I'll call him, and I'll see what he tells me, but this is for sure now." CISNEROS replied, "Okay, call me and let me know around what time so I can be around here."

147.    At approximately 2:37 p.m., surveillance observed Individual A walk east on 60th Place while talking on the phone. Individual A then entered Cisneros Residence 2. At that same time, CISNEROS, who was using Target Phone 3, called Individual A, who was using Individual A Phone 1 [TP3 Session #2047]. During the call, CISNEROS told Individual A to tell RAMIREZ to get all of CISNEROS' "shoes [money that will be used to purchase the cocaine from JUAREZ]."

148.    At approximately 3:27 p.m. [TP3 Session # 2051], CISNEROS, who was using Target Phone 3, made an outgoing call to JUAREZ, who was using Juarez Phone 1. During the call, JUAREZ stated, "Listen, he said now like in...it could be fifteen minutes or...but before six [6:00 p.m.] he'll, he'll...We're ready. I mean, he doesn't know what time he'll arrive here [what time JUAREZ's supplier will arrive to supply JUAREZ with the drugs]." CISNEROS asked, "But how do you see him, sure or like maybe [CISNEROS asked whether JUAREZ was certain that JUAREZ's supplier would supply him with drugs]?" JUAREZ replied, "No, it's for sure. It's for sure, he's the one that's going to leave it on credit [JUAREZ would take the cocaine on credit and pay it back himself]. That's why, that's why, I'm telling its for sure...he...but he said that before six [6:00 p.m.] he's here. I mean that..it could be

68

before that. But no later then six [6:00 p.m.]. Okay, well let me, me know because...okay, you said it." CISNEROS agreed.

149. At approximately 5:54 p.m. [TP3 Session # 2056], CISNEROS, who was using Target Phone 3, placed an outgoing call to JUAREZ, who was using Juarez Phone 1. During the call, JUAREZ stated, "Hey, I'm on my way." CISNEROS replied, "Okay, you said it. You going, are you going by me too....you know to the apartment [Cisnero's Residence 1]?" JUAREZ stated, "Is it with you or your mom [Cisneros Residence 2]?" CISNEROS replied, "What?" JUAREZ asked, "Same place or with you?" CISNEROS answered, "No, with me." JUAREZ stated, "All right, I'll be there [Cisneros Residence 1] soon."

150. At approximately 6:35 p.m. [TP3 Session # 2075], CISNEROS, who was using Target Phone 3, received an incoming call from JUAREZ, who was using Juarez Phone 1. During the call, JUAREZ stated, "Hey, I'm on my way." CISNEROS said that was okay, or words to the effect. At approximately 6:42 p.m., surveillance observed a red Chevy pull up and park near Cisneros Residence 1. Surveillance observed JUAREZ and another Hispanic male exit the truck and enter the front door of the residence at Cisneros Residence 1. At the same time, surveillance observed CISNEROS at a restaurant near 159th and Harlem Avenue.

151. At approximately 6:47 p.m. [TP3 Session # 2076], CISNEROS, who was using Target Phone 3, placed an outgoing call to RAMIREZ, who was using Ramirez Phone 1. During the call, CISNEROS stated, "Is it done [is the drug deal with JUAREZ done]?" RAMIREZ replied, "Yeah, the man [JUAREZ] is here." CISNEROS stated, "Okay, tell him

69

that, tell him that well...I'm not there but...whatever is missing I'll give it to him. It's like fucking pennies [all the money is not there for the purchase of cocaine but that CISNEROS will give it to JUAREZ]." RAMIREZ responded, "And where's the rest?" CISNEROS stated, "I'm telling you that's just fucking pennies." RAMIREZ replied, "Okay, but...". CISNEROS responded, "Did he say, 'Give it to me?'" RAMIREZ responded, "No, he didn't tell me anything." CISNEROS then stated, "Oh, it's fine, dude. I'll tell him...Check the drawer [look in the drawer for the payment for the narcotics]. (Voices Overlap) Drawer!" RAMIREZ replied, "Okay, okay. And what I have, right?" CISNEROS stated, "Where, where I sleep." RAMIREZ stated, "And what I have right?" CISNEROS replied, "Also..check, check everything and it's going to be...How much do you have?" RAMIREZ answered, "Well, whatever you left me there." CISNEROS asked, "What was it?" RAMIREZ responded, "I don't know, maybe like two [$2,000], I think." CISNEROS asked, "Check, okay?" RAMIREZ affirmed.

152.    At approximately 6:48 p.m. [TP3 Session # 2078], CISNEROS, who was using Target Phone 3, placed an outgoing call to JUAREZ, who was using Juarez Phone 1. During the call, CISNEROS asked, "Can I speak to my brothers?" After RAMIREZ got on the phone, CISNEROS stated, "Okay listen, it's...I have twelve in the drawer [$12,000 for the purchase of narcotics]. Twelve and you have two [$2,000] I think, right? Or how much do you have?" RAMIREZ replied, "Yeah, yeah, I think I have two [$2,000]." CISNEROS then states, "That's fourteen [$14,000]. Tell the six, six are missing [$600 short for the purchase

of cocaine] but I'll give them to him later when I get back if not tomorrow. Whenever, tell him that's no problem, you know. But check it well [make sure the quality and weight of the cocaine is good], ok?" RAMIREZ replied, "Okay." CISNEROS then stated, "Okay. Do me a favor, okay? Check it well in the thing, okay? Because... Check it well on the thing that everything is there [weigh the cocaine on the scale to make sure it is all there]." RAMIREZ affirmed.

153.     At approximately 6:55 p.m., surveillance observed JUAREZ and the other Hispanic male exit the front door of Cisneros Residence 1, re-enter the red pick-up and depart the location. Surveillance units then followed the vehicle. At approximately 7:18 p.m., surveillance agents observed JUAREZ exit the pick-up truck.

154.     At approximately 7:05 p.m. [TP3 Session # 2079], CISNEROS, who was using Target Phone 3, placed an outgoing call to RAMIREZ, who was using Ramirez Phone 1. During the call, CISNEROS asked, "What happened?" RAMIREZ replied, "Nothing, everything is fine." CISNEROS stated, "All right then we're set." RAMIREZ replied, "They already left. Where are you?" CISNEROS answered, "I'm here on La Grange." At the time CISNEROS placed this call, surveillance agents were following him as he drove Cisneros Vehicle 2 on LaGrange Road.

155.     Based on my training and experience, the recorded conversations set forth above, as well my knowledge of the case as a whole, I believe that CISNEROS arranged with LLANES for LLANES to deliver drug proceeds to CISNEROS so that CISNEROS could use

the proceeds to purchase cocaine from JUAREZ. I further believe that CISNEROS then arranged to purchase a half kilogram-quantity of cocaine from JUAREZ for $14,600. CISNEROS then instructed RAMIREZ to meet with JUAREZ at Cisneros Residence 1 because CISNEROS was not home. During the drug deal, CISNEROS told RAMIREZ where CISNEROS stored drug proceeds so that RAMIREZ could pay JUAREZ $14,000, and receive the cocaine on a partially fronted basis. CISNEROS further instructed RAMIREZ to tell JUAREZ that he (CISNEROS) would pay him the additional $600 at a later time. CISNEROS also asked RAMIREZ to check the quantity and quality of the cocaine before JUAREZ left Cisneros Residence 1, and later called RAMIREZ to confirm that the drug deal had taken place according to plan.

156. Two days later, on March 3, 2012 [TP3 Session 2194], CISNEROS, who was using Target Phone 3, spoke to JUAREZ, who was using Juarez Phone 1. During the call, CISNEROS and JUAREZ agreed to meet at Dona Maria's Restaurant located at 6121 South Archer Road, Summit, IL 60501.

157. Agents established surveillance inside of Dona Maria's at approximately 3:03 p.m. Upon entering the restaurant, surveillance observed CISNEROS sitting with JUAREZ and an unidentified Hispanic Male. At approximately 3:14 p.m., surveillance observed JUAREZ get up from the table and walk to the register to pay for the meal. JUAREZ and the unidentified male then departed the restaurant.

158. On March 4, 2012 [TP3 session 2236], CISNEROS, who was using Target

72

Phone 3, spoke with JUAREZ, who was using Juarez Phone 1. During the call, CISNEROS and JUAREZ discussed how much money CISNEROS had paid JUAREZ. JUAREZ stated that CISNEROS had only given him "three two" (possibly, $13,200), and CISNEROS stated that he had given JUAREZ "three, two and a half (possibly $13,250)." JUAREZ then stated, "Just leave it like that. Everything's fine, Gallo. Anyways, you already did me a favor with the car." JUAREZ later stated, "Alright then, call me when you are ready."

159.    Based on my training and experience, the recorded conversations set forth above, as well my knowledge of the case as a whole, I believe that during this call JUAREZ told CISNEROS that CISNEROS still owed JUAREZ $1400 for the half kilogram of cocaine that was partially fronted to him. JUAREZ told CISNEROS not to worry about the $50, and to call him when he was ready to purchase more cocaine.

**R.    CISNEROS, Through CABRERA, Attempts to Sell Cocaine to an Unknown Buyer (March 8, 2012).**

160.    On or about March 8, 2012, between approximately 8:33 p.m. and 8:53 p.m., CISNEROS, who was using Target Phone 2, exchanged a series of text messages with CABRERA, who was using Cabrera Phone 1. At approximately 8:33 p.m. [TP2 Session #2800], CISNEROS wrote, "Bring the baby sitter movie [quantity of cocaine]." At approximately 8:34 p.m. [TP2 Session #2801], CABRERA wrote, "K [okay]." At approximately 8:42 p.m. [TP2 Session #2804], CISNEROS wrote, "Go by the currency for

73

me [LLANES residence]."[24] At approximately 8:43 p.m. [TP2 Session #2805], CABRERA responded, "K [okay]." At approximately 8:53 p.m. [TP2 Session #2806], CISNEROS asked, "Where u at."

161. At approximately 8:57 p.m. [TP2 Session #2809], CISNEROS, who was using Target Phone 2, had a conversation with CABRERA, who was using Cabrera Phone 1. During the call, CABRERA asked, "Just wait there [at LLANES' apartment]?" CISNEROS later stated, "Yeah, just go up there [to LLANES' apartment]." CABRERA then stated, "I'll call you so you could call him [LLANES] out." CISNEROS stated, "Yeah." At approximately 9:00 p.m. [TP2 Session #2810], CISNEROS, who was using Target Phone 2, had a conversation with CABRERA, who was using Cabrera Phone 1. During the call, CABRERA stated, "Tell him [LLANES] I'm right here in front, or in the parking lot." CISNEROS replied, "Alright, just go upstairs." CABRERA stated, "I don't know what apartment it is." CISNEROS later stated, "The last one [apartment]." CABRERA responded, "Let him know I'm going."

162. Based on my training and experience, the recorded conversations and text messages set forth above, as well my knowledge of the case as a whole, I believe that CABRERA was meeting with LLANES to obtain a quantity of cocaine that LLANES was either storing or had purchased on behalf of the CISNEROS DTO.

163. At approximately 9:11 p.m. [TP2 Session #2815], CISNEROS, who was using

---

[24] According to surveillance in this case, LLANES lives in an apartment above a currency exchange.

Target Phone 2, spoke to CABRERA, who was using Cabrera Phone 1. During the call, CISNEROS stated, "Just stop by [to see CISNEROS]." CABRERA asked, "Should I just go by GAVILAN [LNU]?" CISNEROS stated, "Yeah." CABRERA stated, "Alright, then I'll go there [to see GAVILAN] and then go see you."

164.    At approximately 9:17 p.m. [TP2 Session #2823], CISNEROS, who was using Target Phone 2, had a conversation with CABRERA, who was using Cabrera Phone 1. During the call, CABRERA stated, "Yeah, I'm already here [meeting with GAVILAN]." CISNEROS replied, "Alright, cool." CABRERA asked, "He's [GAVILAN] supposed to give me one movie [a kilogram of cocaine], right?" CISNEROS replied, "Yeah." CABRERA stated, "Not, not the whole movie. It wasn't a whole movie [CABRERA did not receive a kilogram of cocaine]." CISNEROS replied, "I know. I know."

165.    At approximately 9:28 p.m. [TP2 Session #2826], CISNEROS, who was using Target Phone 2, had a conversation with CABRERA, who was using Cabrera Phone 1. During the call, CISNEROS stated, "Where you at?" CABRERA replied, "Right here [at a meeting with a potential cocaine buyer], man. I don't know, man. This nigga' [cocaine buyer] said no [U/I]." CABRERA continued, "He don't want it [the cocaine that CABRERA was selling for CISNEROS]." CISNEROS replied, "All right, that's fine." CISNEROS then stated, "Hey, do me a favor, hum, just, hold it down [store the cocaine], no?" CABRERA replied, "What do you mean? Yeah but this nigga', I don't know, man. Fern's [FERNANDO LLANES] is bogus." CISNEROS replied, "Yeah?" CISNEROS replied, "Yeah?"

75

CABRERA replied, "Yeah, cause it's [the cocaine is] not, it's not what it's supposed to be [poor quality]. Yeah." CISNEROS replied, "Okay, don't worry about it, okay."

166. CABRERA then stated, "And it's [the cocaine is] not all there, either." CISNEROS replied, "Huh?" CABRERA stated, "It's not all there either." CISNEROS stated, "Like what?" CABRERA replied, "Like it's twelve [12 ounces of cocaine]." CISNEROS stated, "Wow, just hold it [store the cocaine] now." CABRERA replied, "Alright." CISNEROS replied, "And come this way [to meet CISNEROS]. Hey." CABRERA replied, "Just leave it [cocaine] here with him [GAVILAN]?" CISNEROS responded, "Leave it there man! You don't fucking listen." CABRERA replied, "Okay, so I'm a leave it [cocaine] here [with GAVILAN]." CISNEROS replied, "And then when you come, come, uh, park in the garage [of Cisneros Residence 1]."

167. Based on my training and experience, the recorded conversations set forth above, as well my knowledge of the case as a whole, I believe that CABRERA obtained cocaine from LLANES, and then confirmed with CISNEROS that the cocaine he obtained was less than the quantity he expected. CABRERA then attempted to sell the cocaine to an unknown buyer, but the buyer refused to purchase the cocaine because of its poor quality. CISNEROS instructed CABRERA to then store the cocaine at GAVILAN's residence.

**S.    Law Enforcement Officers Seize 154.1 Grams of Cocaine from ROSALES After CISNEROS and RAMIREZ Purchase Cocaine from a Supplier; CABRERA Attempts to Sell the Cocaine to a Drug Customer (March 19-20, 2012).**

168. On or about March 19, 2012, between approximately 1:34 p.m. and 2:35 p.m.,

CISNEROS, who was using Target Phone 2, exchanged a series of text messages with ROSALES, who was using Rosales Phone 1. At approximately 1:34 p.m. [TP2 Session #3592], CISNEROS asked, "Hey if I could go by u, u think I could see you today first [collect money for cocaine that CISNEROS fronted to ROSALES] then we could go eat [CISNEROS can resupply ROSALES with cocaine] tomorrow?" At approximately 1:42 p.m. [TP2 Session # 3593], ROSALES responded, "Ok I might have2go out there in hr let me find out if not yeah u could come2 me let u know in 30." CISNEROS and ROSALES then exchanged several text messages in which they arranged to meet later that day.

169. At approximately 5:23 p.m. [TP2 Session #3603], CISNEROS, who was using Target Phone 2, had a conversation with ROSALES, who was using Rosales Phone 1. During the call, ROSALES stated, "I'm at the [traffic] light on 63rd and Harlem." CISNEROS and ROSALES then agreed to meet "about two minutes later" near a park where ROSALES had previously dropped CISNEROS off.

170. Several hours later, on March 19, 2012, at approximately 8:06 p.m.[TP3 Session #2471], CISNEROS, who was using Target Phone 3, spoke with RAMIREZ, who was using Ramirez Phone 1. RAMIREZ told CISNEROS, "Hey, what's up? Listen, I went to go see this buddy. Well, he looks the same, the dude. He's not fucked up or anything. It's all, I mean the buddy ended up so-so. He's like the last time that we saw the other dude." RAMIREZ then stated, "Well, I - I got em in my hand [RAMIREZ is examining the cocaine]." CISNEROS replied, "Huh? Well, too bad. Oh well. Well, it's up to you [it is up

77

to RAMIREZ whether to purchase the cocaine]." RAMIREZ replied, "Well, yeah, it's straight [meaning RAMIREZ would purchase the cocaine]."

171. Based on my training and experience, the recorded conversations set forth above, as well my knowledge of the case as a whole, I believe that ROSALES met with CISNEROS and gave CISNEROS money for fronted cocaine. I further believe that RAMIREZ then met with an unknown cocaine supplier and purchased more cocaine to be distributed by the CISNEROS DTO.

172. On or about March 20, 2012, between approximately 11:54 a.m. and 12:53 p.m., CISNEROS, who was using Target Phone 2, exchanged a series of text messages with ROSALES, who was using Rosales Phone 1. At approximately 11:54 a.m. [TP2 Session #3630], CISNEROS stated, "Yoooo." At approximately 11:59 a.m. [TP2 Session # 3635], ROSALES asked, "1230 [meeting time]?" At approximately 12:38 p.m. [TP2 Session #3637], CISNEROS responded, "K [okay]."

173. At approximately 12:39 p.m. [TP3 Session #2487], CISNEROS, who was using Target Phone 3, spoke with RAMIREZ who using Ramirez Phone 1. RAMIREZ asked CISNEROS whether his "mom" put "two or three" "peppers" in the salsa. CISNEROS replied, "Two (referring to a quantity of cocaine)." Surveillance then observed RAMIREZ exit Cisneros Residence 2 and walk to Cisneros Residence 1.

174. At approximately 12:44 p.m. [TP2 Session #3642], CISNEROS, who was using Target Phone 2, sent a text message to ROSALES, who was using Rosales Phone 1, and

asked ROSALES, "Where u by?" At approximately 12:44 p.m. [TP2 Session #3643], ROSALES responded, "Park." At approximately 12:47 p.m. [TP2 Session #3644], ROSALES asked, "Need me2 pick u up? Or am I coming in I'm by 63rd harlem." At approximately 12:48 p.m. [TP2 Session #3645], CISNEROS stated, "Pra 2 min. [Cisneros Residence 1, which is located across from a church]." At approximately 12:49 p.m. [TP2 Session # 3646], ROSALES stated, "Ok ill be inside." At approximately 12:52 p.m. [TP2 Session # 3647], ROSALES stated, "Here [at Cisneros Residence 1]." At approximately 12:53 p.m. [TP2 Session #3648], CISNEROS stated, "K [okay]."

175.   Based on my training and experience, the recorded conversations set forth above, as well my knowledge of the case as a whole, I believe ROSALES planned to pick up a quantity of cocaine from CISNEROS. CISNEROS then called RAMIREZ and instructed him to bring the cocaine from Cisneros Residence 2 (where it was stored) to Cisneros Residence 1 (where ROSALES would pick it up).

176.   At approximately 12:48 p.m., surveillance observed ROSALES, who was driving Rosales Vehicle 1, arrive and park in front of Cisneros Residence 1. Surveillance observed ROSALES exit the vehicle and enter Cisneros Residence 1. At approximately 12:54 p.m., surveillance observed ROSALES exit Cisneros Residence 1,enter Rosales Vehicle 1, and depart the location. Based on my training and experience, the recorded conversations set forth above, as well my knowledge of the case as a whole, I believe ROSALES obtained a quantity of cocaine from CISNEROS.

177. Surveillance followed ROSALES and observed the following: ROSALES drove to a Pep Boys store located at the intersection of 63rd and LaGrange Road in Countryside, Illinois, where, at approximately 1:03 p.m., ROSALES met with an unidentified man outside of Rosales Vehicle 1. ROSALES opened the hood of his vehicle, left it open, and entered the vehicle with the unidentified man. After about one minute, the unidentified male exited Rosales Vehicle 1. Based on my training and experience, the recorded conversations set forth above, as well my knowledge of the case as a whole, I believe that ROSALES and the unidentified male engaged in a narcotics transaction.

178. At approximately 1:13 p.m., surveillance observed ROSALES depart Pep Boys and travel south on LaGrange Road. At approximately 1:38 p.m., an officer of the Orland Park Police Department observed that the front window of Rosales Vehicle 1 was obstructed, and initiated a traffic stop of the vehicle. Another law enforcement officer who observed the suspected drug deal at the Pep Boys parking lot approached the vehicle and asked ROSALES whether he had drugs in Rosales Vehicle 1. ROSALES said, "Yes." The officer then asked ROSALES where the drugs were, and ROSALES stated words to the effect of, "You'll find them." Because ROSALES stated that there were illegal drugs in his car, officers searched the vehicle.

179. During the search, officers discovered in the center console a large clear plastic bag containing a white powdery substance that appeared to be cocaine. The substance contained in the bag weighed approximately 114.4 grams of suspect cocaine. Officers placed

ROSALES in custody and transported him to the Orland Park Police Lockup.

180.   At the lockup, officers read ROSALES his *Miranda* rights.  ROSALES acknowledged that he understood his rights both orally and in writing.  After acknowledging his rights, ROSALES agreed to answer questions.  During this interview, ROSALES admitted that he had "dope" in his vehicle, and said he thought it weighed "a couple ounces." When questioned about the drug deal in the Pep Boys parking lot, ROSALES stated, "I gave him [the unidentified male] just a little bit [of cocaine that was found in Rosales Vehicle 1], less than a gram."  ROSALES also stated that he lived at Rosales Residence 1 and admitted that he had "a couple eight balls [of cocaine]" secured in a safe at that residence.  ROSALES gave verbal consent for officers to enter Rosales Residence 1 to retrieve the cocaine from that safe.

181.   Law enforcement officers traveled to Rosales Residence 1 and advised an occupant of the house that they were there to recover ROSALES' safe, and that ROSALES had given them permission to do so.  The other occupant of the house gave the officers permission to enter to retrieve the safe and its contents, and then led the officers to the safe, which was already unlocked.  Inside the safe, officers found (a) one large clear plastic bag containing five smaller clear plastic bags, each of which contained a white powdery substance that appeared to be cocaine; (b) three small clear empty plastic bags and a pair of scissors; and (c) a small black scale.  The combined weight of the substance contained in the five small clear plastic bags was approximately 48.4 grams.

81

182.     Agents subsequently submitted the substance to the ISP lab for analysis, which determined that the total amount of the substances seized from ROSALES weighed approximately 154.1 grams and contained Cocaine Hydrochloride.

183.     On March 20, 2012, at approximately 10:49 p.m. [TP2 Session #3769], CISNEROS, who was using Target Phone 2, spoke with CABRERA, who was using Cabrera Phone 1. CISNEROS asked, "Where you at?" CABRERA stated, "Right here. This nigger wants the brand new movies, nigger [the drug customer with CABRERA wanted a quantity of cocaine from the batch that CISNEROS had obtained on March 19, 2012]." CISNEROS asked CABRERA, "That's not, you didn't give him the new movie?" CABRERA stated, words to the effect that he did, but that the drug customer didn't want it. CISNEROS told CABRERA, "All right. That's cool, man. Just uh, do me a favor, just put it somewhere, no?" CABRERA stated, "You want me to take it [cocaine] to my crib?" CISNEROS replied, "No. Somewhere right there, or whatever."

184.     Based on my training and experience, the recorded conversations set forth above, as well my knowledge of the case as a whole, I believe that CABRERA was meeting with a drug customer so that he could supply the customer with cocaine. When CABRERA met with the drug customer, the customer was not satisfied with the quality of the cocaine. After CABRERA relayed the information to CISNEROS, CISNEROS instructed CABRERA to store the cocaine at CABRERA's home.

**T.     CISNEROS and RAMIREZ Purchase Cocaine from GARCIA, and Sell the UCA 125 Grams of Cocaine (March 27, 2012).**

185.    On or about March 26, 2012, the UCA exchanged a series of text messages with CISNEROS, who was using Target Phone 6. The UCA said, "Yo, you gonna be around tomorrow [to sell cocaine]?"[25] The UCA received a text message from CISNEROS in response that read, "Ya bro [advising the UCA that he did have cocaine to sell]." The UCA replied, "I'l be that way around 5:30."

186.    On or about March 27, 2012, at approximately 1:26 p.m., the UCA had a consensually-recorded conversation with CISNEROS, who was using Target Phone 6. During the call, the UCA stated, "Hey, I'm trying to come up that way. You gonna be good or what?" CISNEROS stated, "Yeah, what time." The UCA stated, "Uh, I don't know, maybe five, five thirty." CISNEROS stated, "Yeah, call me when you're headed this way." The UCA stated, "Yeah, I'll give you a call. Hey, I only need half of what I talked to you about. So it will just be a four and a half [4 and one-half ounces.]" CISNEROS replied, "Yeah." The UCA stated, "You good?" CISNEROS stated, "Yeah." The UCA replied, "All right cool. I'll call you when I'm heading that way." CISNEROS affirmed.

187.    On March 27, 2012, between approximately 5:25 p.m. and 8:12 p.m., the UCA exchanged a series of text messages with CISNEROS, who was using Target Phone 6:

a.      In a text message at approximately 5:25 p.m., the UCA stated, "Headed ur way

---

[25]   These text messages and calls were consensual recordings. The Government received authorization to intercept Target Phone 6 on April 12, 2012.

bro." CISNEROS replied, "Give me a few." CISNEROS stated, "Koo what time you thinking?" CISNEROS stated, "Let me make a call." The UCA stated, "Kooo."

b.     Toll records for Target Phone 6, which was being used by Cisneros, reflect that at approximately 5:32 p.m., CISNEROS had a 41 second phone call with number 773-937-0715, a phone later determined to be used by GARCIA[26], a supplier for the CISNEROS DTO;

c.     At approximately 6:56 p.m., CISNEROS stated, "Hes [GARCIA] on his way." The UCA stated, "Kooo, how long?" CISNEROS stated, "leave in like 20." At approximately 7:30 p.m., the UCA stated, "Headed ur way ill hit ya up when I'm close." The UCA then stated, "Where ya want me?"

---

[26]  The identification of GARCIA and GARCIA's voice in this Affidavit is based on the following: As set forth in this affidavit, on April 20, 2012, CISNEROS, who was using Target Phone 6, had a series of conversations with a male using telephone number (773) 937-0715 ("Garcia Phone 1") (See TP6, Session 927, 930, and 961 set forth below). During a conversation that occurred at 8:16 p.m., [TP6, Session #927], GARCIA told CISNEROS he was going to come by the house to talk to him. At approximately 8:30 p.m., surveillance agents observed an individual arrive at Cisneros Residence 3. At approximately 8:35 p.m., surveillance agents observed CISNEROS exit Cisneros Residence 3 and walk toward the individual who was in a vehicle, observed CISNEROS get into the vehicle, and the two men drove to Cisneros Residence 1. At that time, surveillance observed CISNEROS and the male individual enter the front door Cisneros Residence 1. At approximately 8:50 p.m., surveillance observed the same male individual exit the front door of Cisneros Residence 1 and reenter the vehicle in which he came, and depart. At approximately 9:16 p.m., [TP6, Session #961], CISNEROS, who was using Target Phone 6, contacted Garcia Phone 1. During the call, GARCIA told CISNEROS, "the very little bit that I put on my tongue it seems that it is good buddy, check it" [GARCIA tasted the cocaine and it was of good quality]. Surveillance followed the male individual who had just met with CISNEROS, and stopped the vehicle for making a turn without stopping. The male individual identified himself as GARCIA. As set forth in more detail below, GARCIA also had on his person Garcia Phone 1, which showed the number for Target Phone 6 in its call history. Linguists compared the voices from Garcia Phone 1 to the voice on 773-216-3794 and concluded that the voice on each line were the same person, GARCIA.

188.    At approximately 8:05 p.m., the UCA had a series of consensually-recorded calls with CISNEROS, who was using Target Phone 6.[27]    According to the UCA, CISNEROS provided directions to the UCA to the garage behind 7318 W. 61st Street, Summit, Illinois ("Cisneros Residence 3" also referred to as the "Burnt House.").

189.    At approximately 8:10 p.m., the UCA parked in the garage behind Cisneros Residence 3 and met with CISNEROS. While in the garage the UCA observed RAMIREZ come from the alley and run through the garage carrying a white plastic bag that contained a square shaped item that was roughly the size of a kilogram of cocaine. RAMIREZ ran directly into Cisneros Residence 3. During this meeting, which was recorded, the UCA gave CISNEROS $3,200. CISNEROS exited the garage and went into Cisneros Residence 3. A short time later CISNEROS and RAMIREZ exited Cisneros Residence 3 and reentered the garage. RAMIREZ then handed the UCA a plastic bag containing a white powdery substance that appeared to be cocaine. The UCA then departed the location and drove to a briefing location to meet with law enforcement. At approximately 8:17 p.m., the UCA sent CISNEROS a text message on Target Phone 6, stating, "55 south all good."

190.    Based on my training and experience, the recorded conversations set forth above, particularly the call between CISNEROS and GARCIA on March 27, 2012, at 5:32 p.m., as well my knowledge of the case as a whole, I believe that after the UCA contacted CISNEROS to purchase the cocaine, CISNEROS then contacted GARCIA to obtain the

---

[27]  Because the UCA was driving to Cisneros Residence 3 while these phone calls occurred, the UCA was only able to record his half of the conversation through the body recorder.

85

cocaine. GARCIA then met with RAMIREZ and sold him a quantity of cocaine. When the UCA pulled into the garage, RAMIREZ had just purchased the kilogram of cocaine from GARCIA and was carrying it into Cisneros Residence 3 to break it down into smaller quantities. Once the cocaine was broken down, CISNEROS and RAMIREZ returned to the garage to sell the UCA the amount of cocaine he requested.

191.    The UCA met law enforcement agents at a briefing location and gave agents the plastic bag containing the white powdery substance that he received from RAMIREZ. Agents submitted the substance to the DEA lab for analysis, which determined that the substance weighed approximately 125 grams and contained Cocaine Hydrochloride.

**U.      CISNEROS Purchases Cocaine from GARCIA and RAMIREZ Stores the Cocaine (April 12-13, 2012).**

192.    On April 12, 2012, at approximately 7:40 p.m.[TP6 Session #8], CISNEROS, who was using Target Phone 6, spoke with GARCIA, who was using (773) 937-0715 ("Garcia Phone 1"). During the call, CISNEROS asked GARCIA if GARCIA could come see him [deliver cocaine to CISNEROS]. GARCIA replied, "However you'd like, if not, if not right now either way I can head over there and see you." CISNEROS stated "No, no if you go over there it's better if you don't. It's better if we take our time tomorrow [meaning conduct the narcotics transaction the following day]."

193.    On April 13, 2012, at approximately 6:49 p.m. [TP6 Session #72], CISNEROS, who was using Target Phone 6, spoke with GARCIA, who was using Garcia Phone 1. CISNEROS asked, "What do you say, cousin? How are you [does GARCIA have cocaine

available]?"  GARCIA replied, "Everything's fine, fine.  And you?"  CISNEROS stated,

"…to see what…if you're going to have time and well, you know."  GARCIA then agreed

to meet CISNEROS before 8:00 p.m.

194.    At approximately 7:54 p.m. [TP6 Session #83], CISNEROS, who was using

Target Phone 6, spoke with GARCIA, who was using Garcia Phone 1.  GARCIA told

CISNEROS "We're here, here outside already."  CISNEROS then told GARCIA he would

be right there.

195.    At approximately 11:45 p.m. [TP6 Session #112], CISNEROS spoke with

RAMIREZ, who was using Ramirez Phone 2.  CISNEROS told RAMIREZ, "I'm arriving

here." RAMIREZ replied, "Did you come with everything [bring all the cocaine with you]?"

CISNEROS replied "Yeah."

196.    Based on my training and experience, the recorded conversations set forth

above, as well my knowledge of the case as a whole, I believe CISNEROS purchased a

quantity of cocaine from GARCIA, GARCIA delivered the cocaine to CISNEROS, and

CISNEROS then brought the cocaine to RAMIREZ to store and distribute.

**V.      CISNEROS Purchases a Quarter-Kilogram Quantity of Cocaine from
          JUAREZ Using Money Received from RAMIREZ, MORALES, ABEJA,
          Individual C,  and Others, for Fronted Cocaine (April 16-17, 2012).**

197.    As set forth below, on April 16, 2012, ABEJA collected money from a

CISNEROS DTO drug customer and agreed to deliver the money to CISNEROS.  Between

April 16 and 17, 2012, CISNEROS arranged to purchase a quarter-kilogram quantity of

cocaine from JUAREZ for $7,500. During the negotiation, CISNEROS received money from RAMIREZ, MORALES, ABEJA, Individual C, and others, for fronted cocaine. CISNEROS then paid JUAREZ for the cocaine. After CISNEROS purchased the cocaine from JUAREZ, he then distributed the cocaine back to ABEJA and other narcotics distributors.

198. On April 16, 2012, at approximately 4:01 p.m.[TP6 Session #397], CISNEROS, who was using Target Phone 6, had a conversation with ABEJA, who was using Cabrera Phone 1.[28] During the call ABEJA told CISNEROS, "Rosko [Individual C] came

---

[28] The identification of ABEJA and ABEJA's voice in the affidavit is based on the following: First, as set forth in more detail below, on May 6, 2012 between 12:52 p.m. and 3:57 p.m., CISNEROS, who was using Target Phone 6, had a series of conversations with a male who was using who was using 316010151003039 (hereinafter, "Abeja Phone 3") (See TP6, Session ## 1828, 1837, 1844, 1847). During one of the conversations, CISNEROS asked the male individual, "You want me to, you want me to uh, you want me to stop by you?" The man who was later identified as ABEJA stated, "I mean if you want I'll stop by you before I leave." At approximately 3:41 p.m. [TP6, Session #1844], ABEJA stated, "I'm over here by Burger King." At approximately 3:57 p.m., surveillance observed a light colored Mitsubishi 2-door sedan pull onto 55th Place and park on the north side of the street in the middle of the block. Agents observed a male individual who was later identified as ABEJA exit the passenger side of the vehicle and enter the building (Morales Residence 1), which is located near a Burger King. At approximately 4:02 p.m., ABEJA exited Morales Residence 1, re-entered the Mitsubishi, and departed the area. As set forth in more detail below, surveillance observed an Illinois State Police officer, who was conducting a roadside seatbelt check,, motion the Mitsubishi to pull over as it was traveling on Interstate 55. While the occupants of the Mitsubishi were stopped, CISNEROS attempted to contact ABEJA by phone [TP6 Session #'s 1849, 1856, 1858, &1864] without success. At approximately 4:25 p.m., surveillance units observed the Illinois State Police release the Mitsubishi. Subsequently, agents confirmed with the Illinois State Police that they stopped the Mitsubishi and cited both occupants for wearing no seat belts. According to the Illinois State Police officers, the passenger identified himself as ABEJA After the stop, at approximately 4:26 p.m. [TP6, Session #1869], CISNEROS, who was using Target Phone 6, had a conversation with ABEJA, who was using Abeja Phone 3. During the call, ABEJA stated, "What up, what up?" CISNEROS asked, "You straight?" ABEJA told CISNEROS, "Man, shit, as soon as I jumped on I-55, these stupid fucking state police are fucking checking for seat belts and they pulled us over. But they didn't do shit, they just gave us tickets, tickets for no seat belts."

right here by my crib to drop something off for you [dropped off money for fronted cocaine]." ABEJA said that he would bring the money to CISNEROS. ABEJA then asked CISNEROS, "What happened? Nothing or what [asking CISNEROS if obtained any more cocaine yet]?"

199. On April 17, 2012, at approximately 12:24 p.m. [TP6, Session # 436], CISNEROS, who was using Target Phone 6, received an incoming call from MORALES, who was using X-43964 ("Morales Phone 2"). During the call, MORALES stated, "Are we good or what?" CISNEROS replied, "Yeah, let me get on it." At approximately 12:36 p.m. [TP3, Session #442], CISNEROS, who was using Target Phone 6, received an incoming call from RAMIREZ, who was using X-036450 ("Ramirez Phone 2"). During the call, CISNEROS stated, "Are you almost done or what (meaning done selling all the cocaine he had left)?" RAMIREZ stated he would hopefully be done in a little while. At approximately 12:43 p.m. [TP6, Session #444], CISNEROS received an incoming call from JUAREZ, who was using 316010167476394 ("Juarez Phone 2"). During the call, CISNEROS asked, "What's going on?" JUAREZ stated, "Give me an hour and I'll call you back. I'll be ready."

200. At approximately 12:47 p.m.[TP6, Session # 447], CISNEROS, who was using

Second, on May 7, 2012, following several calls between CISNEROS, who was using Target Phone 6 and ABEJA, who was using Abeja Phones 2 and 3, surveillance identified ABEJA as the individual who met with CISNEROS prior to the deal after having compared a digital photograph attached to an Illinois driver's license of Javier ABEJA and confirmed the individual was Javier ABEJA. Finally, I've compared the voice on Abeja Phone 3 with the voice of the individual who used X-022671 ("Abeja Phone 1"), 111*384*10883 (hereinafter, "Abeja Phone 2") and it is the same voice.

Target Phone 6, called ABEJA, who was using X-022671 ("Abeja Phone 1"). During the call, CISNEROS stated, "He [JUAREZ] told me an hour but you know how the fuck that shit goes [before JUAREZ dropped off more cocaine]." ABEJA stated, "All right, my guy [drug customer] is still at work. He just called me up and said 'Man, you know, we wanna check,' but uh, for the leftover ones, they wanna see." CISNEROS stated, "I'll let you know within the hour bro, cause they said in an hour." At approximately 2:48 p.m. [TP6, Session #463], CISNEROS, who was using Target Phone 6, called a drug customer who was later identified as "Jay LNU" at telephone number X-41768."[29] CISNEROS stated, "Hey I'm right here by my OG's, by my brothers [meaning Cisneros Residence 1]." At approximately 2:54 p.m., "Jay LNU" called CISNEROS [TP6, Session # 472] and stated he was in the back [of Cisneros Residence 1]. At approximately 2:55 p.m., surveillance agents observed a Hispanic male [believed to be the drug customer or his associate] exit the rear of Cisneros Residence 1 and enter the passenger seat of a tan Nissan.

201.    At approximately 4:19 p.m. [TP6, Session # 482], CISNEROS, who was using Target Phone 6, spoke to JUAREZ, who was using Juarez Phone 2. During the call, JUAREZ stated, "Hey, there's one but…it's [cocaine] guaranteed but it's not the way you like it, but it's bad ass. It's guaranteed and all." CISNEROS stated, "But everything, like that?" JUAREZ stated, "Yes, shiny, just the way you like it [good quality cocaine]." CISNEROS asked, "But dissolved [is it pure or cut down]?" JUAREZ stated, "I haven't seen it yet but

---

[29] On March 3, 2012, in call sessions associated with Target Phone 2 [Sessions 2453 and 2455], the caller from Jay LNU Phone 1 identified himself as "Jay."

they told me that, and that it's guaranteed. What do you think?" CISNEROS stated, "If you can, yes. But, yes." JUAREZ asked, "How much do you need?" CISNEROS stated, "Like a quarter or something (one-fourth kilogram of cocaine)."

202.    At approximately 4:44 p.m. [TP6, Session #484], CISNEROS, who was using Target Phone 6, had a conversation with JUAREZ, who was using 316010151013490 (hereinafter, "Juarez Phone 3"). During the call, JUAREZ asked, "Where is the drop off going to be? By your mom (Cisneros Residence 2) or with you (Cisneros Residence 1)?" CISNEROS replied, "By me if you please."

203.    At approximately 4:51 p.m. [TP6, Session #487], CISNEROS, who was using Target Phone 6, received a call from ABEJA, who was using Abeja Phone 1. During the call, ABEJA asked, "So what, what? For sure, in a half, half in an hour or you don't know yet?" CISNEROS stated, "He said supposedly, you know? But, let me, let me just peep it. Supposedly but you know, hold on."

204.    At approximately 6:14 p.m. [TP6, Session #495/497], CISNEROS, who was using Target Phone 6, received an incoming call from JUAREZ, who was using Juarez Phone 3. During the call, JUAREZ stated, "I'm here already." CISNEROS stated, "What happened, did you call me?" JUAREZ stated, "Yes, I'm right here already." CISNEROS stated, "I'll go over there right now. Either way, my brother (RAMIREZ) is there, no?" At approximately 6:16 p.m., [TP6, Session #501], CISNEROS, who was using Target Phone 6, made an outgoing call to RAMIREZ, who was using Ramirez Phone 2. During the call,

91

CISNEROS stated, "Where are you?" RAMIREZ stated, "At the house." CISNEROS stated, "El Potro [JUAREZ] is there dude." RAMIREZ stated, "What?" CISNEROS stated, "El Potro is there." RAMIREZ stated, "Where?" CISNEROS stated, "I don't know. In front, in back, I don't know." RAMIREZ stated, "Okay, what do you want me to do?" CISNEROS stated, "Well open for him and check that very well and give him nothing but small bills and its going to be seven five [$7,500 for the cost of the fourth kilogram of cocaine]."

205.    At approximately 6:16 p.m., surveillance observed JUAREZ walk into the front door of Cisneros Residence 1.

206.    At approximately 6:20 p.m. [TP6, Session # 510], CISNEROS, who was using Target Phone 6, had a conversation with RAMIREZ, who was using Ramirez Phone 2. During the call, RAMIREZ stated, "Hey dude, it has a lot, a lot of dirty [the cocaine had been diluted]." CISNEROS stated, 'But how does it look to you?" RAMIREZ stated, "It's all right but you know?" CISNEROS stated, "Well, what else can we do?" CISNEROS then asked, "Are they [JUAREZ and drug associate] still there?" RAMIREZ replied, "Yeah." CISNEROS stated, "Ask them if they have, but not like that. If they have something bigger, tell them that another one but it has to be, if it's solid. Only if it's solid, if not [CISNEROS was asking RAMIREZ to ask the supplier about purchasing a kilogram of cocaine, but only if it was of good quality]." RAMIREZ stated, "What do you want me to do with this one? You want me to keep it?" CISNEROS stated, "Oh, get it, yeah."

207.    At approximately 6:21 p.m. [TP6, Session #512], CISNEROS, who was using

92

Target Phone 6, had a conversation with ABEJA, who was using Abeja Phone 1. During the call, CISNEROS stated, "Yeah, I'm over here, like in seven, eight minutes, Nigga I'm ready." ABEJA stated, "You're gonna come by me?" CISNEROS stated, "Yeah." ABEJA stated, "All right, let me call this guy up." At approximately 6:23 p.m. [TP6 Session# 516], CISNEROS had a conversation with MORALES, who was using Morales Phone 2. During the call, CISNEROS stated, "We already ready dude." MORALES stated, "Of the bad ass kind?" CISNEROS stated, "Yeah." MORALES stated, "All right then, let me call the dude to swing by."

208.    At approximately 6:25 p.m., surveillance observed JUAREZ and another unidentified male Hispanic exit the front door of Cisneros Residence 1 and enter a grey Toyota. The unidentified subject was driving while JUAREZ was in the front seat passenger. JUAREZ and the unidentified man departed the area.

209.    Based on my training and experience, the recorded conversations set forth above, as well my knowledge of the case as a whole, I believe CISNEROS negotiated with JUAREZ to purchase one-fourth kilogram of cocaine for $7,500. CISNEROS received money from workers and drug customers, such as RAMIREZ, MORALES, ABEJA, and Individual C. CISNEROS paid JUAREZ for the cocaine through RAMIREZ, and then distributed the cocaine back to members of his organization.

### W. CISNEROS Purchases One Kilogram of Cocaine from GARCIA with RAMIREZ, MORALES, CABRERA, LLANES, GAVILAN, and DIANE CISNEROS (April 17, 2012).

210.  Between April 17 and 18, 2012, as set forth in more detail below, CISNEROS arranged to purchase one kilogram of cocaine from GARCIA for $24,000. CISNEROS then spoke to MORALES to confirm that the deal was for one kilogram of cocaine, and then instructed CABRERA and DIANA CISNEROS to obtain money from Cisneros Residence 3 and bring it to Cisneros Residence 1. CABRERA transported the money to Cisneros Residence 1, where CISNEROS purchased a kilogram of cocaine from GARCIA. Once CISNEROS purchased the cocaine, CISNEROS left Cisneros Residence 1, and then later called MORALES to confirm the cocaine has been broken down. CISNEROS then returned to distribute the cocaine to members of his organization.

211.  On April 17, 2012, at approximately 6:34 p.m. [TP6, Session # 526], CISNEROS, who was using Target Phone 6, had a conversation with GARCIA, who was using Garcia Phone 1. During the call, GARCIA stated, "What's new? Are you all set to work?" CISNEROS stated, "Yes! Yes!" GARCIA stated, "Are you ready?" CISNEROS stated, "Yes." GARCIA stated, "Okay, hmm, around how much do you have with you there?" CISNEROS stated, "Like two-four, something like that [$24,000]." GARCIA stated, "Two-four you have?" CISNEROS stated, "Yes." GARCIA stated, "Okay, there's no problem cousin, so I'll stop by later on over there." CISNEROS stated, "Sounds good."

212.  At approximately 6:54 p.m. [TP6, Session #534], CISNEROS, who was using

94

Target Phone 6, had a conversation with MORALES, who was using Morales Phone 2. During the call, CISNEROS stated, "What happened?" MORALES stated, "He's [GARCIA] already on his way bro. Right now when he gets here I'll get there in a hurry." CISNEROS stated, "One [one kilogram]?" MORALES stated, "Right now when he arrives, he's on his way." CISNEROS stated, "One?' MORALES replied, "Yes, one."

213. At 7:18 p.m., surveillance, via pole camera, observed MORALES walk into the rear of Cisneros Residence 1. At 7:26 p.m. [TP2, Session #5678], CISNEROS, who was using Target Phone 2, spoke to CABRERA, who was using Cabrera Phone 1, and told CABRERA to pick him up, and asked CABRERA to, "tell my girl [DIANA CISNEROS] to call me, before you come."

214. At approximately 7:27 p.m. [TP2, Session # 5680], CISNEROS, who was using Target Phone 2, received an incoming call from DIANA CISNEROS, who was using Diana Cisneros Phone 1. During the call, CISNEROS instructed DIANA CISNEROS to give CABRERA his "shoes" (money) that were in the drawer. DIANA CISNEROS asked if CISNEROS wanted all of "it" (all of the money CISNEROS had at the residence). CISNEROS told DIANA CISNEROS to tell CABRERA to bring him his "shoes" and that he was by Cisneros Residence 1.

215. At approximately 7:25 p.m., surveillance observed CABRERA, via pole camera, walk into the rear of Cisneros Residence 1. At approximately 7:26 p.m., surveillance observed CISNEROS, via pole camera, exit the rear door of Cisneros Residence 1, and then

95

reenter the rear door of the Cisneros Residence 1 about a minute later.

216.    At approximately 7:38 p.m. [TP6, Session #542], CISNEROS, who was using Target Phone 6, had a conversation with GARCIA, who was using Garcia Phone 1. During the call, GARCIA stated, "We are already on our way. Are you ready?" CISNEROS stated, "Yes." GARCIA stated, "Okay. I'm already on my way around there close by." CISNEROS stated, "Okay, look, uhm, do you remember here by the, right here on the other block?" GARCIA stated, "The other block?" CISNEROS stated, "Further down, do you remember [CISNEROS instructs GARCIA how to get to Cisneros Residence 1]?" GARCIA stated, "Yes, oh, yes, yes, yes."

217.    At 7:34 p.m. surveillance, via pole camera, observed GARCIA walk into the rear door of Cisneros Residence 1. Four minutes later, surveillance observed GARCIA and another male Hispanic male, via pole camera, exit the rear door of Cisneros Residence 1, and walk down the gangway toward the front of the house. At 7:38 p.m. , surveillance, via pole camera, observed CABRERA exit the rear door of Cisneros Residence 1, walk east down the alley toward Cisneros Vehicle 2.

218.    At 7:39 p.m., surveillance, via pole camera, observed CISNEROS exit the rear door of Cisneros Residence 1, walk down the gangway toward the front of the residence, return down the gangway, and possibly enter Cisneros Vehicle 2.

219.    Surveillance then observed, via pole camera, Cisneros Vehicle 2 drive west down the alley. At approximately 7:53p.m. [TP6, Session # 545], CISNEROS, who was

using Target Phone 6, spoke with MORALES, who was using Morales Phone 2. During the call, CISNEROS asked, "Is it ready [asking if the cocaine been broken down, and ready for sale]?" MORALES stated, "Yeah." CISNEROS stated, "Okay I'll pass by right now."

220.    Based on my training and experience, the recorded conversations set forth above, as well my knowledge of the case as a whole, I believe that CISNEROS arranged to purchase one kilogram of cocaine from GARCIA for $24,000. CISNEROS then spoke to MORALES to confirm that the deal was for one kilogram of cocaine, and then instructed CABRERA and DIANA CISNEROS to obtain money from Cisneros Residence 3 and bring it to Cisneros Residence 1. I further believe that CABRERA brought the money to Cisneros Residence 1, where CISNEROS purchased a kilogram of cocaine from GARCIA. Once CISNEROS purchased the cocaine, I believe that CISNEROS left Cisneros Residence 1, and then later called MORALES to confirm the cocaine had been divided. CISNEROS then returned to distribute the cocaine to members of his organization.

**X.    CISNEROS and GARCIA Discuss the Quality of the Cocaine that GARCIA Supplied and CISNEROS Provides Cocaine to CISNEROS DTO Workers and Customers (April 18, 2012).**

221.    On April 18, 2012, at 3:16 p.m. [TP6, Session # 600], CISNEROS, who was using Target Phone 6, had a conversation with GARCIA, who was using Garcia Phone 1. During the call, CISNEROS stated, "By any chance did you see the girl yesterday or not?" GARCIA stated, "The girl [cocaine]?" CISNEROS stated, "Yes." GARCIA stated, "Uhm, no why?" CISNEROS stated, "No, it's because I went to the bar afterwards. Well until now,

97

but it's really ugly [the kilogram of cocaine looked to be of poor quality]. I said, 'Oh Shit.'" GARCIA stated, "Oh really?" CISNEROS stated, "It scared me a little bit." GARCIA stated, "It did scare you a little bit?" CISNEROS stated, "Yes." GARCIA stated, "Because I did tell your brother, you know? I gave him a sample [sample of cocaine] and it was fine, you know? I don't know. You see but it (U/I) like that." CISNEROS stated, "Yes, no, you see that all the time that I go to the bar well the girl is always beautiful and really good [good quality]." GARCIA stated, "Yes, it's really good." CISNEROS stated, "And now she was a bit fat and ugly [cocaine was of poor quality]. I said, 'Oh shit.'" GARCIA stated, "Really? Let me check around and I'll call you back, Primo to see what he [supplier] says." CISNEROS stated, "Okay, that's fine. Thank you so much."

222.    At approximately 3:23 p.m. [TP6, Session # 602], CISNEROS, who was using Target Phone 6, had a conversation with drug customer JAY LNU. During the call, CISNEROS stated, "Hey bro, you gonna have to give me a little bit man. That shit was fucked up." JAY LNU stated, "Say what." CISNEROS stated, "You gonna have to give me a little while bro, cause that bitch [cocaine] was fucked up [poor quality]." JAY LNU stated, "all right."

223.    At approximately 3:53 p.m. [TP6, Session # 607], CISNEROS, who was using Target Phone 6, had a conversation with LLANES, who was using 31601051043964 (hereinafter, "Llanes Phone 3"). During the call, LLANES asked, "You by you?" CISNEROS stated, "Uh, yeah, just go right there by uhm, By V's [ABEJA, who lives next

to Cisneros Residence 1] next door." LLANES stated, "All right cool, just go holler at him?" CISNEROS stated, "What's up?" LLANES stated, "Uh, go back there by these guys?" CISNEROS stated, "Hold on, let me call him [ABEJA], all right?" LLANES affirmed.

224.    At approximately 4:09 p.m. [TP6, Session # 611], CISNEROS, who was using Target Phone 6, had a conversation with LLANES, who was using Llanes Phone 3. During the call, CISNEROS stated, "Yeah go ahead. But make sure when you're done man, you see my brother [when LLANES was done selling the cocaine to give the money to RAMIREZ] because I still haven't seen Spook [GARCIA] and he had a bad baptism and you know [provided CISNEROS with bad cocaine]." LLANES stated, "Yeah, I got you my nig. Honestly man I shouldn't even done that. I would've seen him that night too. I went up there and knocked the shit and I kind of knew fucking Little Spook was gonna be on some bull shit. But you haven't seen him til right now?" CISNEROS stated, "I still haven't seen him." LLANES stated, "All right, I am gonna call him right now. I'll take care of it [LLANES will contact GARCIA, who is LLANES' relative, to try and remedy GARCIA'S sale of poor quality of cocaine to CISNEROS]." CISNEROS stated, "Nah, don't worry about it." At approximately 4:10 p.m., [TP6, Session # 612], CISNEROS, had a conversation with LLANES. During the call, CISNEROS stated, "Hey, go see my brother." LLANES stated, "Yeah I got you."

225.    At approximately 5:11 p.m. [TP6, Session # 624], CISNEROS, who was using Target Phone 6, had a conversation with RAMIREZ, who was using Ramirez Phone 2.

During the call, RAMIREZ stated, "Ferns [LLANES] came over." CISNEROS stated, "What happened?" RAMIREZ stated, "You sent him." CISNEROS stated, "Yes, why?" RAMIREZ stated, "Oh okay. So then I left him the two [quantity of cocaine] bro so he came and left one [a quantity of money]." CISNEROS stated, "That what?' RAMIREZ stated, "He left me two but he paid for one." CISNEROS stated, "Okay then, oh well." RAMIREZ stated, "All right. And Spook [GARCIA] hasn't arrived yet but when he gets here. Either way, that's what I am here for the same [same quantity that LLANES received]. Call him and when he gets here to come up, no?" CISNEROS affirmed. CISNEROS then stated, "Where are you?" RAMIREZ stated, "Well right here at the house bro." CISNEROS stated, "What was I going to tell you? So how many are left [how much cocaine]?" RAMIREZ stated, "Uh, of that one, no more because I gave him the two. Of the other ones the same is there what you left yesterday." CISNEROS stated, "So that was it?" RAMIREZ stated, "Yeah, I only need one to get paid." At approximately 5:12 p.m. [TP6, Session # 625], CISNEROS had a conversation with RAMIREZ. During the call, CISNEROS stated, "Did you take it?" RAMIREZ stated, "Yeah yesterday I grabbed one, don't you remember?" CISNEROS stated, "Okay." RAMIREZ stated, "All right. He said later he would bring me the money from that dude." CISNEROS affirmed.

226.    At approximately 5:37 p.m. [TP6, Session #648], CISNEROS, who was using Target Phone 6, had a conversation with telephone number X-98243, (hereinafter,

100

"GAVILAN LNU Phone 1")[30].  During the call, GAVILAN LNU stated, "What are you doing?  Are you by the house?"  CISNEROS stated, "No I'm out, I went for a ride."  GAVILAN LNU stated, "I'll stop by in a little [to purchase a quantity of cocaine]."  CISNEROS affirmed.

227.   At approximately 5:39 p.m. [TP6, Session #649], CISNEROS, who was using Target Phone 6, had a conversation with LLANES, who was using Llanes Phone 3.  During the call, CISNEROS asked, "Hey I was gonna tell you, did you ever finish with the other one, the one from before?"  LLANES stated, "Which one is that?"  CISNEROS stated, "The little ones, you remember?"  LLANES stated, "The three right?  Yeah, I'm gonna give you 150, I think I got right here for the three [quantity of cocaine].  I know what you're talking about.  And I'm almost done with the two [quantity of cocaine] that I took.  I gave him one of the two [LLANES paid for half of the cocaine that he took from RAMIREZ] that I took, and I already have the other half right now, and I'm just waiting for someone else to come through and I'll throw you that little extra also." [LLANES would pay CISNEROS for fronted cocaine, and LLANES will pay CISNEROS extra money as a result of the delay in paying him back].  CISNEROS stated, "All right, cool bro."

228.   At approximately 5:52 p.m. [TP6, Session #655], CISNEROS, who was using Target Phone 6, had a conversation with RAMIREZ, who was using Ramirez Phone 2.  During the call, CISNEROS stated, "Guero (Spanish for "white guy," meaning Individual

---

[30]  GAVILAN LNU is identified in this affidavit on the basis that the caller associated with Gavilan Phone 1 identified himself as Gavilan.

C) is on his way [to drop of money for cocaine previously obtained from CISNEROS]."
RAMIREZ stated, "What did I give that scumbag." CISNEROS stated, "Two of the,
remember the ugly ones [poor quality of cocaine]." RAMIREZ stated, "The medium ones?
The ones medium well?" CISNEROS stated, "Yeah."

229.   As set forth in more detail below, after CISNEROS purchased cocaine from
GARCIA on April 17, 2012, CISNEROS told GARCIA that the quality of the cocaine was
poor. CISNEROS arranged for LLANES to pick up the cocaine, sell it, and then leave the
drug proceeds with RAMIREZ. Later, ABEJA told CISNEROS that he would try to sell the
cocaine that was of poor quality to one of his customers because it was the only cocaine he
had available to sell at the time.

**Y.    GARCIA Negotiates with his Supplier to Sell CISNEROS a Kilogram of
Cocaine at a Discounted Price, and ABEJA Agrees to Sell the Cocaine
that is of Poor Quality (April 18-23, 2012).**

230.   At approximately 5:55p.m., [TP6, Session # 657], CISNEROS, who was using
Target Phone 6, had a conversation with GARCIA, who was using Garcia Phone 1. During
the call, GARCIA stated, "I was just talking to these guys and he told me that it was the last
of what they had. That everything was the same and they don't know why that one came out
that way. But he says that if you can work that one that way, that next time they will take
care of us, they will give us a discount [if CISNEROS could sell the kilogram of cocaine, the
suppliers would give him a discount on the next kilogram of cocaine]." CISNEROS stated,
"The thing is that she's too fat. She's very worn out. She's nothing like, in comparison to…"

102

GARCIA stated, "In comparison to the other one?" CISNEROS stated, "Right, as if they just made it like that." GARCIA stated, "Yeah, well that's what he told me and he said, 'why didn't you call me sooner?' I told him no because these guys also go and work, they unloaded and all, and they just started. He said 'well we can't do anything about it anymore. Tell him that if they can do it like that.' Let me give him another call. Is it the same or how is it?" CISNEROS stated, "She looks pretty but she's very ugly. She looks as if she had already been working at two or three bars. She looks worn out." CISNEROS continues, "That's why I asked you if you saw the woman because..." GARCIA stated, "Yeah I saw her too. I even told your brother. I grabbed her and she did give a good kick and all but you know that sometimes. I mean, I had never had a problem with that you know. Everything was good, so I thought everything was good. Let me give them another call to see what they tell me." [GARCIA sampled the cocaine and said that it was of good quality].

231. At approximately 5:59 p.m., [TP6, Session # 658], CISNEROS, who was using Target phone 6, had a conversation with GARCIA, who was using Garcia Phone 1. During the call, GARCIA stated, "I already spoke with them. And he said that if you can work with it and he says that the following week and he could throw it to you for twenty-seven [the next kilogram of cocaine would be sold to CISNEROS for $27,000]. He said that right now it's the only one that he had. And that all of the rest, of those I told him, maybe he might want to return it. You see that the first one were there they were you know how they were already. I told him you you know that we don't complain all of us. I told him you already know. He

told me, the thing is that the tickets [money] I think they passed them up front already. So they are waiting for the new one for the weekend. And they said they can give it to you for twenty seven. CISNEROS stated, "The problem is that if it were even at twenty five I still wouldn't, I wouldn't even, even if the next one were at twenty five , if you do the math, no..." "It's that id you see it, you understand me?" GARCIA affirmed. CISNEROS stated, "Put it at sixty, or seventy, eighty, around there [meaning 60 - 80% purity of the cocaine]." GARCIA affirmed. CISNEROS stated, "But if one wants to, do you understand me?" GARCIA stated, "Yes, Yes. So then in how much give or take?" CISNEROS stated, "Why? It's because not even the burn, that's truth you see." CISNEROS and GARCIA continued to discuss the poor quality of the cocaine and GARCIA agreed to come and look at the cocaine to verify whether the cocaine was of poor quality.

232.    At approximately 6:05 p.m., [TP6, Session #664], CISNEROS, who was using Target Phone 6, had a conversation with GARCIA, who was using Garcia Phone 1. During the call, GARCIA stated, "I spoke with him and he said that the tickets (money) have already walked like that. But they said that the contract is already around here and he says for you to hold onto it for two or so days and he can change it for you, no problem. He says that everything was the same, but since it was the last of it from there." CISNEROS stated, "But it looks like someone returned it." GARCIA stated, "Yeah I told him they only touched the corner of it. The way you gave it to me, is the way it was delivered. They just checked it out very well, so there isn't a problem (with it). He told me, tell him to hold onto it there while

104

we get the other one, and then we can exchange it for him." CISNEROS stated, "Okay, sounds good. When more or less?" GARCIA stated, "He said by Friday at the latest. So today is Wednesday, tomorrow is Thursday, so it should be around some time on Friday." CISNEROS stated, "Okay, well I have no other choice." [GARCIA had already given the money to the cocaine suppliers. The suppliers would not give the money back, but they would exchange the cocaine when they received a new supply].

233.    On April 20, 2012, CISNEROS and GARCIA had several conversations using Target Phone 6 and Garcia Phone 1. At approximately 8:16 p.m., [TP6, Session #927], CISNEROS, who was using Target Phone 6, had a conversation with GARCIA, who was using Garcia Phone 1. During the call, GARCIA told CISNEROS he was going to come by the house to talk to him. At approximately 8:30 p.m., surveillance agents observed a Grey Audi ("Garcia Vehicle 1"), pull up in front of Cisneros Residence 3. A male individual, who was later identified as GARCIA, exited the car and walked up to the front door of the residence. At approximately 8:33 p.m., [TP6, Session #930], CISNEROS, who was using Target Phone 6, called RAMIREZ, who was using Ramirez Phone 2. During the call, CISNEROS told RAMIREZ to go downstairs and grab "that" (referring to the bad cocaine so it could be looked at and returned to GARCIA).

234.    At approximately 8:35 p.m., surveillance agents observed CISNEROS exit Cisneros Residence 3 and walk to Garcia Vehicle 1 with GARCIA, and both subjects then entered the vehicle and drove west on 61st Street. Garcia Vehicle 1 then parked in front of

Cisneros Residence 1, and surveillance observed GARCIA and CISNEROS enter the front door Cisneros Residence 1.

235.    At approximately 8:50 p.m., surveillance observed GARCIA exited the front door of Cisneros Residence 1 and reentered Garcia Vehicle 1. Surveillance then observed GARCIA drive to Will County, Illinois.

236.    At approximately 9:16 p.m., [TP6, Session #961], CISNEROS, who was using Target Phone 6, had a conversation with GARCIA, who was using Garcia Phone 1. During the call, GARCIA told CISNEROS, "the very little bit that I put on my tongue it seems that it is good buddy, check it" [GARCIA tasted the cocaine and it was of good quality].

237.    As GARCIA drove near the intersection of Maple and Cedar Road, in New Lenox, Illinois, surveillance observed GARCIA make a right hand turn without stopping at the red light. Law enforcement officers stopped GARCIA's vehicle and interviewed him.

238.    During the interview, GARCIA gave consent for law enforcement officers to search his person and vehicle. Agents recovered two cellular phones from GARCIA's pocket, and GARCIA consented to the search of his cellular phones. Agents discovered that one of the phones was Garcia Phone 1, scrolled through the recent contacts and observed that Garcia Phone 1 had been used to contact Target Phone 6. They further observed that Target Phone 6 was a saved as "Primo 1" in Garcia Phone 1's address book.

239.    On April 23, 2012, at approximately 4:11 p.m., [TP6, Session #1251], CISNEROS, who was using Target Phone 6, had a conversation with ABEJA, who was using

106

111*384*10883 (hereinafter, "Abeja Phone 2"). During the call, ABEJA stated, "Yeah, hey, uh. Just talked to my guy right now. Hey! He said he wanna know if that's all you're gonna have all week or...or what you know?" CISNEROS stated, "Uh huh, probably until the weekend bro." ABEJA stated, "All right. Well, let me see what he says because he said he might just take it. Fuck. But I'll call you back right now." CISNEROS stated, "Well, let me know. All right bro."

240.    Based on my training and experience, the recorded conversations set forth above, as well my knowledge of the case as a whole, I believe that ABEJA told CISNEROS that he would try to sell the cocaine that was of poor quality to one of his customers because it was the only cocaine he had available to sell at the time.

241.    At approximately 5:04 p.m., [TP6, Session #1257], CISNEROS, who was using Target Phone 6, had a conversation with MORALES, who was using Morales Phone 2. During the call, CISNEROS stated, "How are you or what?" MORALES stated, "We are somewhat there." CISNEROS stated, "Well at least half or what? I mean, the half of that or what?" MORALES stated, "Well almost somewhat I think so. Or there's a little bit." CISNEROS stated, "Like how much, eight?" MORALES stated, "maybe. Maybe around seven, eight, around there."

242.    Based on my training and experience, the recorded conversations set forth above, as well my knowledge of the case as a whole, I believe that CISNEROS asked MORALES how much cocaine he had sold, and MORALES told CISNEROS that he had

sold approximately half of what CISNEROS had given him.

**Z.** **JUAREZ Tells CISNEROS that he Received a Shipment of Cocaine (April 20, 2012).**

243. On April 20, 2012, at approximately 9:42 p.m. [TP6 Session #981], CISNEROS, who was using Target Phone 6, spoke with JUAREZ, who was using Juarez Phone 2. CISNEROS asked, "What's the word? How are you?" JUAREZ replied, "Well here, right now, we're at a hundred [JUAREZ had cocaine to sell]." CISNEROS replied, "Okay, okay. No, well, listen... I think that by Monday or Tuesday because you see..." JUAREZ affirmed.

244. Based on my training and experience, the recorded conversations set forth above, as well my knowledge of the case as a whole, I believe JUAREZ called CISNEROS to tell CISNEROS that he had received a shipment of cocaine. CISNEROS told JUAREZ that he did not need to purchase cocaine at that time, but would do so on Monday or Tuesday.

**AA.** **CISNEROS Arranges to Supply Individual C with 2 Ounces of Cocaine and Another Drug Customer with 2 Ounces of Cocaine Using RAMIREZ and MORALES (April 24, 2012).**

245. As set forth in more detail below, on April 24, 2012, Individual C, a CISNEROS DTO drug customer, arranged to purchase two ounces of cocaine from CISNEROS, and CISNEROS instructed Individual C to obtain the cocaine from RAMIREZ. Individual C attempted to obtain the cocaine from RAMIREZ, but RAMIREZ was unable to give Individual C the cocaine because RAMIREZ's family was home at the time. CISNEROS and Individual C arranged for Individual C to obtain the cocaine the next day.

Additionally, as set forth in more detail below, on April 24, 2012, CISNEROS and MORALES arranged to supply a drug customer with four and one-half ounces of cocaine, and CISNEROS told MORALES to obtain the cocaine from RAMIREZ. RAMIREZ later confirmed that he did not supply the drug customer with two ounces (the amount was decreased from four and one-half ounces) of cocaine, because the drug customer only had $1,800. Accordingly, MORALES told CISNEROS that he had instructed the drug customer to return the following day when he had all the money.

246.   On April 24, 2012, at approximately 3:58 p.m. [TP6 Session # 1302], CISNEROS, who was using Target Phone 6, had a conversation with MORALES, who was using Morales Phone 2. During the call, MORALES stated, "All right, my buddy called me." CISNEROS stated, "Yes bro, yes, yes." MORALES stated, "All right well, your bro [RAMIREZ] doesn't answer and I was calling him and he never answered." CISNEROS stated, "Just stop over there by him and don't get impatient." MORALES stated, "All right, it's going to be six four." CISNEROS stated, "Huh, how much does he want?" MORALES stated, "Six four." CISNEROS stated, "What's that?" MORALES stated, "Sixty four." CISNEROS stated, "It's sixty three Indian [63 grams of cocaine or 2 and one-fourth ounces]." MORALES stated, "All right then, I'm just going to stop by your brothers then."

247.   At approximately 4:57 p.m. [TP6, Session #1304], CISNEROS, who was using Target Phone 6, had a conversation with Individual C, who was using 316010151011892

(hereinafter, "Individual C Phone 2").[31] During the call, Individual C stated, "Where you at?" CISNEROS stated, "Man I'm not even around. What's up? What's with you, you straight?" Individual C stated, "Yeah I'm good. I'm ready." Individual C stated, "Uh, yeah. By the OG's crib or by your brothers [Cisneros Residence 1]?" CISNEROS stated, "My brother [Cisneros Residence 1]." Individual C stated, "(U/I) this guy." CISNEROS stated, "To who?" Individual C stated, "To V [ABEJA, short for Vicious])?" CISNEROS stated, "To who?" Individual C stated, "(U/I) go next door by V?" CISNEROS stated, "Yeah, go upstairs." Individual C affirmed.

248. At approximately 4:59 p.m. [TP6, Session #1307], CISNEROS, who was using Target Phone 6, had a conversation with RAMIREZ, who was using Ramirez Phone 2. During the call, CISNEROS asked, "Where you at? At the house?" RAMIREZ stated, "Yeah." CISNEROS stated, "The white dude [Individual C] is going to go over. Can you make something for him [prepare some cocaine for him]." RAMIREZ stated, "Okay, what time is he going to come?" CISNEROS stated, "In a little while." RAMIREZ stated, "Okay, uh, how much should I make?" CISNEROS stated, "From one, make it double [take a quantity of cocaine and mix it with a 'cut' to make double the quantity of cocaine]." RAMIREZ affirmed.

249. At approximately 5:15 p.m., surveillance observed, via pole camera, a tan Nissan, Illinois backing into a spot behind Cisneros Residence 1. Surveillance then observed

---

[31] I compared the voice on Individual C Phone 1 to Individual C Phone 2 and they are the same voice.

Individual C exit the driver's seat of the tan Nissan and enter the rear door of Cisneros Residence 1. At approximately 5:19 p.m., surveillance observed the tan Nissan exit the alley onto 61st Street traveling west. The Nissan appeared to have two occupants. Surveillance observed that while the tan Nissan was traveling east on 79th Street, it changed lanes on three occasions without signaling.

250.    Law enforcement officers stopped the tan Nissan. During the stop, the driver identified himself as Individual C and the passenger identified himself as Individual D.

251.    During the interview, Individual C admitted that he was a Latin King gang member, and that Individual C's street name was "Rosko." Individual C consented to the officers searching his vehicle, but no contraband was recovered. Officers gave Individual C a verbal warning for the traffic violations.

252.    At approximately 5:26 p.m. [TP6, Session #1313], CISNEROS, who was using Target Phone 6, had a conversation with RAMIREZ, who was using Ramirez Phone 2. During the call, RAMIREZ stated, "hey dude, Porky [MORALES] says that he needs a pair of donuts [two ounces of cocaine]." CISNEROS stated, "Yeah, that's what he told me, right?" RAMIREZ stated, "A pair." CISNEROS stated, "Wasn't it a little more [meaning 2 ¼ ounces instead of 2 ounces]?" RAMIREZ stated, "No, just two." CISNEROS affirmed.

253.    At approximately 5:27 p.m. [TP6, Session #1315], CISNEROS, who was using Target Phone 6, had a conversation with MORALES, who was using Morales Phone 2. During the call, MORALES stated, "You talked to him?" CISNEROS stated, "Yeah, go

111

ahead [meaning to go pick up the two ounces of cocaine]." MORALES affirmed.

254. At approximately 5:28 p.m. [TP6, Session #1316], CISNEROS, who was using Target Phone 6, had a conversation with GAVILAN LNU. During the call, GAVILAN LNU stated, "Hey cousin, I was going to ask you, to see if you had the same paint [cocaine] as the other day?" CISNEROS stated, "Yeah." GAVILAN LNU stated, "Okay set aside the same for me." CISNEROS stated "What was it, one [quantity of cocaine]?" GAVILAN LNU stated, "Okay, you said it."

255. At approximately 6:20 p.m. [TP6, Session #1318], CISNEROS, who was using Target Phone 6, had a conversation with RAMIREZ, who was using Ramirez Phone 2. During the call, RAMIREZ stated, "That buddy told me that it was a six three [63 grams]." CISNEROS stated, "I told you." RAMIREZ stated, "Either way, I can't do it right now. I have a house full of people here. And I told him to come later. But he said no that it's fine. I understood maybe until tomorrow, but as soon as I'm free I'm going to do it." CISNEROS stated, "Who, who?" RAMIREZ stated, "They're eating. The whole gang is here. Moms, children." CISNEROS stated, "What are you talking about?" RAMIREZ stated, "About the white guy [Individual C]." CISNEROS stated, "Oh, what happened? Oh did he leave already?" RAMIREZ stated, "Yeah, but he didn't bring that for me [Individual C did not bring any money]. And then I told him [Individual C], hey can you come back later on? He [Individual C] said yeah, yeah, yeah bro. I gotta go and do something and this and that. So I'll probably stop by tomorrow so. But I want to get it ready today." CISNEROS stated, "All

112